**Ladonna JOENS, Plaintiff,**

v.

**JOHN MORRELL & CO., a Delaware Corporation, Defendant.**

**No. C 01–4088–MWB.**

United States District Court, N.D. Iowa, Western Division.

Feb. 7, 2003.

Stanley E Munger, Jay Elliott Denne, Munger, Reinschmidt & Denne, Sioux City, IA, for Plaintiff.

Melanie L Carpenter, Gary P Thimsen, Woods, Fuller, Shultz & Smith, PC, Sioux Falls, SD, Scott C Folkers, Scott Folkers Law Firm, Sioux Falls, SD, Leslie R Stellman, Barry Bach, Hodes, Ulman, Pessin & Katz, PA, Towson, MD, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *BACKGROUND* .................................................................. 925
 A. *Procedural Background* ...................................................... 925
 B. *Factual Background* .......................................................... 926

II. *LEGAL ANALYSIS* ............................................................. 927
 A. *Standards For Summary Judgment* ......................................... 927
 B. *The Sexually Hostile Work Environment Claim* ............................ 928
 1. *Arguments of the parties* ............................................... 928
 2. *Sufficiency of the alleged harassment* ................................. 929
 a. *Based on sex* ...................................................... 929
 b. *Affecting a term or condition of employment* ..................... 930
 3. *Employer liability* ..................................................... 931
 a. *Employer liability for "supervisor" or "co-worker"*
 *harassment* ....................................................... 931
 b. *Does this case involve "co-worker" or "supervisor"*
 *harassment?* ..................................................... 934
 i. *Who is a "supervisor" within the meaning of Ellerth*
 *and Faragher?* ............................................... 934
 ii. *Was Johnson such a "supervisor"?* ........................... 941
 c. *Are there genuine issues of material fact under the*
 *appropriate standard for employer liability?* ..................... 942
 i. *What constitutes sufficient notice that alleged*
 *harassment is "based on sex"?* ............................... 943
 ii. *Was sufficient notice given here?* ............................. 945
 C. *The Disparate Treatment Claim* ............................................ 946
 1. *Arguments of the parties* ............................................... 946
 2. *Joens's prima facie case* ............................................... 947
 3. *Joens's showing of pretext* ............................................. 948
 D. *Retaliation* ................................................................. 949
 1. *Arguments of the parties* ............................................... 949

2. *Joens's showing in support of her retaliation claim* . . . . . . . . . . . . . . . . . . . 950

III. *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 951

One "burning question" for employer liability for workplace sexual harassment in the wake of the Supreme Court's landmark decisions in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), is, does a particular case involve "supervisor" or "co-worker" harassment? That question—among others—is squarely presented here, on the employer's motion for summary judgment, where the employer initially assumed that the plaintiff's allegations involved only "co-worker" harassment, but the plaintiff responded that the "thrust" or "core" of her claim was harassment by "a foreman" of the company, which she contended required application of the employer liability standards for "supervisor" harassment. At the court's behest, the parties have probed more deeply the question of whether this is a "co-worker" or "supervisor" harassment case, and hence, what standard of employer 1 ability is at issue. Another question of equally "burning" significance here, for purposes of either the employer's *Ellerth/Faragher* affirmative defense, if this is a "supervisor" harassment case, or the plaintiff's proof that the employer knew or should have known of the harassment, if this is a "co-worker" harassment case, is, what kind of complaint from the plaintiff is sufficient to put an employer on notice that the alleged harassment is "based on sex"? The court's resolution of these and other issues related to the plaintiff's claims of sexual harassment, disparate treatment based on sex, and retaliation for complaining about harassment and disparate treatment, are herein.

## I. BACKGROUND

### A. Procedural Background

In this action, filed August 13, 2001, pursuant to Title VII of the Civil Rights Act of 1964, plaintiff LaDonna Joens asserts the following claims against her current employer, defendant John Morrell & Co.: (1) hostile environment sexual harassment; (2) sexual discrimination (disparate treatment) in overtime hours; and (3) retaliation for complaining about sexual harassment and discrimination. This matter is set for trial to begin on March 31, 2003. However, this matter comes before the court pursuant to John Morrell's November 29, 2002, motion for summary judgment on all of Joens's claims, which, if granted, would obviate the need for any trial. Joens resisted John Morrell's motion for summary judgment on January 3, 2003, and John Morrell filed a reply in further support of its motion on January 17, 2003.

By order dated January 23, 2003, the court requested that the parties address in their oral arguments certain questions concerning whether this case involves "supervisor" or "co-worker" harassment and what kind of reports of "harassment" would be sufficient to put an employer on notice that such harassment might be "based on sex." In response to that order, John Morrell filed two supplemental affidavits on January 29, 2003, one from Dennis Reitz, concerning who exercised supervisory authority over the "box shop" where the plaintiff was employed, and one from Steve Joyce, John Morrell's Director of Human Resources, concerning who exercises the authority to hire and fire employees in the "box shop" and the company generally.

The court heard the parties' unusually animated and informative oral arguments on John Morrell's motion for summary judgment on January 30, 2003. At the oral arguments, plaintiff LaDonna Joens was represented by Jay E. Denne of Munger, Reinschmidt & Denne, L.L.P., in Sioux City, Iowa. Defendant John Morrell & Co. was represented by Leslie Robert Stellman of Hodes, Ulman, Pessin & Katz, P.A., in Towsen, Maryland, and Scott C. Folkers of John Morrell & Company. John Morrell's motion for summary judgment is now fully submitted.

### B. Factual Background

Although whether or not a party is entitled to summary judgment ordinarily turns on whether or not there are genuine issues of material fact for trial, *see, e.g., Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996), the court will not attempt here a comprehensive review of the undisputed and disputed facts in the record. Rather, the court will present here only sufficient factual background to put in context the parties' arguments for and against summary judgment on Joens's claims.

The parties agree that Joens began working for John Morrell, which operates a meat packing plant in Sioux City, Iowa, in 1986. They also agree that, since the early 1990s, Joens has been employed in the "box shop." At the times pertinent to her complaint, Joens worked the day shift as the operator of a box forming machine, which makes the bottoms of the boxes in which product is placed, while a male employee, Doug Severson, worked at the same job on the evening shift making box tops. Joens's supervisor was Dennis Reitz, while Doug Severson's supervisor was Scott Thompson.

Joens alleges that she was sexually harassed by male-co-workers, who engaged in conduct including sexually suggestive activities with bananas in the lunchroom, telling "blonde jokes," and telling other sexual jokes. She also complains that one male employee engaged in at least one incident of improper touching. However, her claim that she was subjected to a sexually hostile work environment relies primarily on her allegations that a "cut floor foreman" named Herman Johnson almost daily subjected her to lengthy complaints about her performance, in abusive—albeit apparently gender-neutral—terms, when he wanted more boxes or did not think that Joens had provided enough boxes before the start of a "kill" shift. Joens contends that Johnson did not subject men in the box shop to the same kind of treatment. In support of both her disparate treatment claim and her retaliation claim, Joens also alleges that her male counterpart on the night shift, Severson, was permitted to work more overtime hours, and that he was allowed to do so not just because of sex, but in retaliation for Joens's repeated complaints about harassment and the disparity in overtime hours.

John Morrell contends that Joens never complained that any harassment by Johnson was based on sex until she filed her administrative charge with the Iowa Civil Rights Commission and that, in any event, such "harassment" was neither because of sex nor sufficiently severe or pervasive to constitute actionable sexual harassment. John Morrell also contends that Severson's excess overtime hours were not properly authorized, which John Morrell's Human Resources Manager, Steven Joyce, did not discover until he investigated Joens's administrative charge of discrimination. Consequently, John Morrell contends, the disparity was not the result of either discriminatory or retaliatory animus, and, indeed, was contrary to a collective bargaining agreement requiring equalization of hours between shifts. John Morrell also contends that, for the year following its corrective actions, which included notifying Severson that he could only work overtime

when authorized to do so by a supervisor, Joens actually worked slightly more overtime hours than did Severson. Thus, John Morrell contends that the record does not support either disparate treatment or retaliation, any more than it supports a sexually hostile work environment.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

As this court has explained on a number of occasions, applying the standards of Rule 56 of the Federal Rules of Civil Procedure providing for summary judgment, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Quick,* 90 F.3d at 1377 (same). Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir.1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hosps., Inc.,* 133 F.3d 1104, 1107 (8th Cir.1998); *Reed v. Woodruff County. Ark.,* 7 F.3d 808, 810 (8th Cir.1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the

pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel,* 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.,* 475 U.S. at 586–87, 106 S.Ct. 1348). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.,* are "material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). Finally, this court has repeatedly taken note of the rule in this circuit that, because summary judgment often turns on inferences from the record, summary judgment should seldom or rarely be granted in employment discrimination cases. *See, e.g., Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir. 1991)). The court will apply these standards to John Morrell's motion for summary judgment on Joens's claims.

## B. The Sexually Hostile Work Environment Claim

### 1. Arguments of the parties

In its opening brief in support of its motion for summary judgment, John Morrell contended that the behavior upon which Joens's sexually hostile work environment claim is based, such as abusive comments by Johnson, was not based on her gender; that the incidents about which she complains are not sufficiently severe or pervasive, either individually or in aggregate, to support such a claim; and that John Morrell was either unaware of, or took prompt action to remedy, Joens's complaints of sexual harassment. However, it is apparent that John Morrell initially addressed Joens's hostile environment claim on the assumption that it was based on co-worker misconduct, such as the "banana episodes," jokes, and one incident of improper touching.

In her response, however, Joens clarifies that the "banana episodes," jokes, and touching incident are not the "core" of her claim, although she contends that they support her contention that the working environment at John Morrell was sexually hostile. Rather, she now contends that the "thrust" or "heart" of her hostile work environment claim is the abusive tirades to which she was allegedly subjected by Herman Johnson. She argues, further, that even harassment in gender-neutral terms, like that to which she was subjected by Johnson, can support a sexual harassment claim, if it was meted out only to persons of one gender and was sufficiently severe or pervasive, as she alleges was the case with Johnson's abusive comments to her. Because Joens characterizes Johnson as a "supervisor," she contends that John Morrell's liability on her hostile environment claim must be judged according to the Ellerth/Faragher standards,[1] which impose vicarious liability on an employer if a supervisor's harassment resulted in a tangible employment action, and liability subject to an affirmative defense if it did not. She also argues that John Morrell's failure to address the proper Ellerth/Faragher standards for employer liability for harassment by a supervisor means that the court need not address the employer liability elements of her harassment claim. However, if the court does so, she contends that the disparity in overtime hours is a tangible employment action subjecting John Morrell to vicarious liability for Johnson's sexual harassment and that, in the alternative, there are genuine issues of material fact on the elements of John Morrell's Ellerth/Faragher affirmative defense.

In its reply in further support of its motion for summary judgment, John Morrell challenges the sufficiency of Joens's sexually hostile environment claim as clarified or redefined by Joens in her resistance. John Morrell contends that, even conceding that gender-neutral comments may suffice to support a sexual harassment claim, if the comments are nevertheless because of sex, there is nothing in this record but Joens's uncorroborated testimony that Johnson only subjected Joens, but not men in the box shop, to the allegedly abusive comments. John Morrell presents the contrary affidavit of Herman Johnson himself averring that he also complained to male box shop employees about their performance and disputing the frequency of his complaints to Joens about her performance. John Morrell also reiterates its contention that Joens has not pointed to any evidence of harassment that is sufficiently severe or pervasive to be actionable, even if one assumes that Johnson's

---

1. These standards are articulated in the Supreme Court's decisions in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

# 929

conduct was based on Joens's sex. Next, John Morrell contends that there is no connection between the purported sexual harassment and the purported tangible employment action upon which Joens relies, so that John Morrell is entitled to invoke the *Ellerth/Faragher* affirmative defense. On the elements of that defense, John Morrell contends that there are no genuine issues of material fact, and that John Morrell is, instead, entitled to summary judgment.

## 2. Sufficiency of the alleged harassment

■ Leaving aside, for the moment, the question of whether or not Johnson is a "supervisor," and the requirements for proof of employer liability that flow from the answer to that question, the court agrees with the parties that the first four elements of Joens's claim of a sexually hostile work environment are the following: (1) that she is a member of a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a term, condition, or privilege of employment. *See Beard v. Flying J. Inc.*, 266 F.3d 792, 797 (8th Cir.2001) (stating these four elements as required "[t]o establish a submissible case of sex discrimination," without regard to the employer liability elements for harassment by a co-worker or supervisor); *and compare Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 736 (8th Cir.2000) (citing these four elements in a case involving harassment by a supervisor, citing *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 888 (8th Cir.1998)); *with Rheineck v. Hutchinson Technology, Inc.*, 261 F.3d 751, 755 (8th Cir.2001) (citing these four elements in a co-worker harassment case); *Bogren v. Minnesota*, 236 F.3d 399, 407 (8th Cir. 2000) (same), *cert. denied*, 534 U.S. 816, 122 S.Ct. 44, 151 L.Ed.2d 16 (2001); *Stuart v. General Motors Corp.*, 217 F.3d

621, 631 (8th Cir.2000) (same). In its motion for summary judgment, John Morrell contends that Joens cannot generate genuine issues of material fact on the "based on sex" element or the "affect on a term or condition of employment" element.

### a. Based on sex

■ John Morrell contends that if Johnson "harassed" Joens at all, his conduct was not "sexual" harassment, because he meted out such conduct to both men and women. However, the court finds that Joens has designated "specific facts showing that there is a genuine issue for trial," FED. R. CIV. P. 56(e), in light of governing law, *see Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 ("Only disputes over facts that might affect the outcome of the suit under the governing law" are "material."), on the issue of whether Johnson harassed Joens "based on [her] sex." *See, e.g., Beard*, 266 F.3d at 797 (third element of a sexually hostile environment claim). First, in *Carter v. Chrysler Corp.*, 173 F.3d 693 (8th Cir.1999), upon which Joens relies, the Eighth Circuit Court of Appeals recognized that "[a]ll instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus. Harassment alleged to be because of sex need not be explicitly sexual in nature." *Carter*, 173 F.3d at 700–01 (internal citations omitted). Joens asserts that she was subjected to, and points to evidence of, conduct by Johnson that, while not overtly discriminatory, nevertheless may have been part of a course of conduct which is tied to evidence of discriminatory animus, *id.*, because she points to evidence that only she, not her male counterparts, was subjected to such conduct on a daily basis.

■ Moreover, in *Beard v. Flying J. Inc.*, 266 F.3d 792 (8th Cir.2001), the Eighth Circuit Court of Appeals rejected the defendant's argument—like John Morrell's argument here—that the alleged harassment was not "based on sex," because the alleged harasser subjected males to the same kind of conduct that was the basis for the female plaintiff's sexual harassment claim. *See Beard*, 266 F.3d at 798. More specifically, the defendant in that case argued that, because of the harasser's like conduct toward males, "women were not 'exposed to disadvantageous terms or conditions of employment to which [males were] not exposed,'" as required to show that the conduct was "based on sex." *Id.* (quoting *Schoffstall v. Henderson*, 223 F.3d 818, 826 (8th Cir. 2000)). However, the Eighth Circuit Court of Appeals concluded that in a case supposedly involving the same conduct toward men and women,

> [a] plaintiff ... need not show ... that only women were subjected to harassment, so long as she shows that women were the primary target of such harassment. *See Quick v. Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir.1996). Viewing the evidence in the light most favorable to [the plaintiff] a jury could reasonably find that the vast majority of [the harasser's] activities of a harassing nature was directed toward female employees, and could thus conclude that the harassment of [the plaintiff] was based on sex.

*Beard*, 266 F.3d at 798. John Morrell's evidence—such as Johnson's assertion in his affidavit that he made complaints about job performance without regard to gender and John Morrell's other evidence that Johnson subjected both men and women to comments similar to those on which Joens bases this claim—is in conflict with Joens's deposition testimony that Johnson subjected her exclusively or almost exclusively to such conduct. *See id.* Thus, Joens's deposition testimony is sufficient to generate a genuine issue of material fact that Joens, as a female employee in the box shop, was the primary target of such "harassment," such that a reasonable jury could conclude that Johnson's conduct was "based on sex." *Id.* The court cannot simply choose to disbelieve Joens's deposition testimony at the summary judgment stage of the proceedings, even if it is "uncorroborated," as John Morrell contends. *See, e.g., Quick*, 90 F.3d at 1376–77 (the trial judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial). Therefore, John Morrell is not entitled to summary judgment on the ground that Joens cannot establish this element as a matter of law.

### b. Affecting a term or condition of employment

■ Next, John Morrell contends that, even if Johnson's treatment of Joens was "based on [her] sex," it was not sufficient, as a matter of law, to affect a term, condition, or privilege of employment, *see Beard*, 266 F.3d at 797 (fourth element), in that it was not sufficiently "severe or pervasive." As the Eighth Circuit Court of Appeals also explained in *Beard*, with regard to this element of a sexual harassment claim, "Title VII makes actionable only conduct that is 'severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.'" *Id.* at 798 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

■ John Morrell relies on cases involving parades of horribles in which the Eighth Circuit Court of Appeals has nevertheless held that the alleged harassment was not sufficiently severe or pervasive as demonstrating that the conduct of Johnson in this case does not constitute actionable

harassment. *See Duncan v. General Motors Corp.*, 300 F.3d 928, 931–32 (8th Cir. 2002); *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 966–67 (8th Cir.1999); *Callanan v. Runyun*, 75 F.3d 1293, 1296 (8th Cir.1996). In all three cases upon which John Morrell relies, the court explained that pertinent factors to consider in determining whether conduct was sufficiently severe or pervasive include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or merely an offensive utterance; and whether it unreasonably interferes with an employee's work performance. *See Duncan*, 300 F.3d at 934; *Scusa*, 181 F.3d at 967; *Callanan*, 75 F.3d at 1296. In all three of these cases, the court rejected the sufficiency of the plaintiff's allegations on the ground that the incidents cited were too few and far between. *See Duncan*, 300 F.3d at 935 (rejecting the claim based on "four categories" of conduct involving nine or ten incidents); *Scusa*, 181 F.3d at 967 (observing that the plaintiff relied on only nine incidents); *Callanan*, 75 F.3d at 1296 (agreeing with the district court "that the conduct to which [the plaintiff] was subjected was not 'frequent, severe, physically threatening, or humiliating'"). Here, on the other hand, Joens has designated "specific facts showing that there is a genuine issue for trial" on the issue of severity and pervasiveness, *see* Fed. R. Civ. P. 56(e) (the non-movant's burden), by pointing to her deposition testimony that Johnson's conduct occurred almost daily over several years, and involved lengthy tirades and abusive language each time, thereby identifying evidence of conduct that a jury could reasonably find was frequent, severe, humiliating, and interfered with her work performance. *See, e.g. Duncan*, 300 F.3d at 934 (listing these factors). Again, the court cannot simply weigh the evidence and determine the truth of the matter, as John Morrell seems to ask the court to do, but must instead determine whether there are genuine issues for trial. *Quick*, 90 F.3d at 1376–77. Such genuine issues of material fact are present here on this element of Joens's claim of sexual harassment.

### 3. Employer liability

Finding that Joens has otherwise generated genuine issues of material fact on the elements of her hostile environment claim based on Johnson's conduct, the court turns, next, to the question of whether she can generate genuine issues of material fact that John Morrell should be held liable for the harassment to which she was allegedly subjected. The answer to that question may depend upon the standard for employer liability, which in turn depends upon the "burning question" of whether or not Johnson was a "co-worker" or "supervisor," as explained in the Supreme Court's decisions in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

### a. Employer liability for "supervisor" or "co-worker" harassment

In *Ellerth* and *Faragher*, the Supreme Court declared the standards for an employer's liability for harassment *by a supervisor*, as follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any

sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275. Thus, in the wake of *Ellerth* and *Faragher,* an employer is subject to vicarious liability for harassment by a supervisor, if that harassment resulted in a "tangible employment action," but the employer's liability for harassment by a supervisor is otherwise contingent upon an affirmative defense.

■ On the other hand, even after *Ellerth* and *Faragher,* the Eighth Circuit Court of Appeals has reiterated that in order to establish employer liability for harassment *by co-workers,* a plaintiff must establish that the employer "knew or should have known of the conduct and failed to take proper remedial action." *See, e.g., Dhyne v. Meiners Thriftway, Inc.,* 184 F.3d 983, 987 (8th Cir.1999) (recognizing that this standard of "direct" liability still applies to co-worker harassment after *Ellerth* and *Faragher* ); *accord Rheineck,* 261 F.3d at 755 (elements of a co-worker harassment claim); *Bogren,* 236 F.3d at 407 (same); *Stuart,* 217 F.3d at 631 (same). Thus, in "co-worker" harassment cases, the plaintiff must prove an additional "knowledge" element to establish the employer's liability for the harassment.

The court believes that the following "flow chart" may be helpful in determining the standards for an employer's liability for acts of its employees in sexual harassment cases:

## Flow Chart of Employer Liability Issues in Sexual Harassment Cases

Is the harasser of so high a rank as to be the organization's "proxy"?[1]

**YES** | **NO**

Liability is automatically imputed to the ER.

"Supervisor" Harassment | Is the alleged harasser the plaintiff's supervisor? | "Co-worker" Harassment

**YES** | **NO**

Did the harasser take a tangible employment action against the plaintiff?[2]

Did the ER know or should it have known about the harassment?[7]

**YES** | **NO** **YES** | **NO**

The ER is liable (similar to the old quid pro quo standard).[3]

Did the ER fail to take proper and appropriate corrective action?[8]

**YES** | **NO**

The ER is not liable.

Is the harassment nevertheless severe or pervasive enough to constitute a hostile work environment?[4]

**YES** | **NO**

The ER is liable unless it can prove both elements of the *Ellerth/Faragher* affirmative defense.[5]

The ER is not liable.

The ER is liable (if the harassment is sufficiently severe or pervasive).

1: Did the ER exercise reasonable care to prevent **and** promptly correct the sexually harassing behavior?

2: Did the EE unreasonably fail to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise?[6]

NO to either: | YES to both:

The ER is liable. | The ER is not liable.

[1] "In [*Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993)], the individual charged with creating the abusive atmosphere was the president of the corporate employer, 510 U.S., at 19, who was indisputably within that class of an employer organization's officials who may be treated as the organization's proxy."

*Faragher*, 524 U.S. at 789 (citing cases holding that liability is imputed to an employer when the harasser is the owner, proprietor, a partner or corporate officer, or otherwise "sufficiently high in the management hierarchy").

[2] "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. . . . No affirmative defense is available . . . when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Ellerth*, 524 U.S. at 765.

[3] *See id.* at 752-53 (noting that, formerly, "[t]he standard of employer responsibility turned on which type of harassment occurred," and that "[i]f the plaintiff established a *quid pro quo* claim, the Courts of Appeals held, the employer was subject to vicarious liability").

[4] *See id.* at 753-54 (where harassment does not result in a "tangible employment action," the claim "requires a showing of severe or pervasive conduct," citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998)).

[5] "When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c)." *Id.* at 765.

[6] The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

[7] *See, e.g., Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 987 (8th Cir. 1999) (recognizing that this standard of "direct" liability still applies to co-worker harassment after *Ellerth* and *Faragher*).

[8] *See id.* ("Our court has long recognized that an employer may be *directly* liable for [non-supervisory co-worker] harassment if it knew or should have known of the conduct and failed to take proper remedial action.").

### b. Does this case involve "co-worker" or "supervisor" harassment?

As mentioned above, John Morrell assumed in its opening brief that any liability it might have for harassment of Joens would be based on the "knew or should have known" standard for employer liability for "co-worker" harassment. However, in both Joens's response and John Morrell's reply, the parties argue the case under the *Ellerth/Faragher* standards for employer liability for "supervisor" harassment, based on the status of the alleged primary harasser, Herman Johnson, as "a foreman" at John Morrell. Thus, to determine whether or not this is a "co-worker" or "supervisor" harassment case, the court must resolve the following questions: (a) what kind of "supervisory" authority over the plaintiff is required for the application of the *Ellerth/Faragher* standards for employer liability rather than liability based on a "knew or should have known" standard for "co-worker" harassment; and (b) what evidence is there in the record that Herman Johnson exercised sufficient supervisory authority over Joens to make this a "supervisor" harassment case rather than a "co-worker" harassment case?

### i. Who is a "supervisor" within the meaning of Ellerth and Faragher?

Although the Supreme Court did not answer directly the question of who is a "supervisor" within the meaning of the standards for employer liability established in *Ellerth* and *Faragher, see Mikels v. City of Durham, NC,* 183 F.3d 323, 333 (4th Cir.1999) (noting that, in *Ellerth* and *Faragher,* the Court did not have directly before it the question of what defines a supervisor, and thus "attempt[ed] no definitive explanation of what conduct short of that culminating in tangible employment action can be found nevertheless to be 'aided by the

agency relation'"), the Court did provide significant guidance concerning (1) what authority defines a "supervisor," and (2) over whom the supervisor must wield such authority to implicate the Ellerth/*Faragher* standards for employer liability. As to the authority defining a "supervisor," the Supreme Court reasoned that a "supervisor" is aided by his or her agency relationship with the employer to commit the harassment when the supervisor takes "a tangible employment action" against a subordinate. *See Ellerth,* 524 U.S. at 760, 118 S.Ct. 2257. More specifically, the Supreme Court explained,

> When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. A tangible employment action in most cases inflicts direct economic harm. *As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury. A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct. But one co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special province of the supervisor.* The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.
>
> Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors. The supervisor often must obtain the imprimatur of the enterprise and use its internal processes.
>
> For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate.

*Ellerth,* 524 U.S. at 761–63, 118 S.Ct. 2257 (citations omitted).

The Court then distinguished the circumstance in which a supervisor engages in harassment that "does not culminate in a tangible employment action," noting that it was less obvious in such circumstances that the supervisor was aided by the agency relationship in committing the harassment; indeed, where no tangible employment action is involved, the Court concluded that the supervisor commits essentially the same acts that any co-employee could commit. *Id.* at 763, 118 S.Ct. 2257. On the other hand, the Court noted that "a supervisor's *power and authority* invests his or her harassing conduct with a particular threatening character, and in this sense a supervisor is always aided by the agency relation." *Id.* at 763, 118 S.Ct. 2257 (emphasis added). What "power and authority" was the Court referring to as investing the supervisor's harassment with "a particularly threatening character," if not the supervisor's "power and authority" to take "tangible employment action" against the harassed employee?

 Thus, it appears that it is *the supervisor's power to take tangible employment actions against an employee*— whether or not the supervisor actually does take such a tangible employment action against the employee—that not only defines who is a "supervisor," for *El-*

*lerth/Faragher* purposes, but provides the primary justification for treating employer liability for a supervisor's harassment according to a different standard than employer liability for harassment by a co-worker. In the absence of any such power, a nominal supervisor cannot engage in harassment that is any different from harassment by a co-worker, and consequently, no difference in the standard for employer liability is justified.

■ In further attempting to determine the nature of a "supervisor's" power, that is, the power to take "tangible employment actions," this court notes that the Supreme Court also explained in *Ellerth* that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *see id.* at 761, 118 S.Ct. 2257, and that it "in most cases inflicts direct economic harm." *Id.* at 762, 118 S.Ct. 2257. As noted above, such actions also "require an official act of the enterprise, a company act"; "in most cases [such an act] is documented in official company records, and may be subject to review by higher level supervisors"; and, to take such action, the supervisor "often must obtain the imprimatur of the enterprise and use its internal processes." *Id.*

■ Turning to the issue of over whom the "supervisor" must wield such power, this court notes that, as framed in *Ellerth*, an employer's vicarious liability, or liability subject to the *Ellerth/Faragher* affirmative defense, is applicable only when "a victimized employee [is subjected to] an actionable hostile environment created by a supervisor *with immediate (or successively higher) authority over the employee." Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257 (emphasis added); *see also Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. Similarly, another federal district judge recently explained these principles succinctly, as follows: "[W]here the person who engaged in the unlawful conduct is not the plaintiff's supervisor but rather is one of the plaintiff's co-workers *or a supervisor with no authority over the plaintiff,* the plaintiff must show under the theory of respondeat superior that the employer 'knew or should have known of the harassment in question and failed to take prompt remedial action.'" *Underwood v. Northport Health Services, Inc.,* 57 F.Supp.2d 1289, 1303–04 (M.D.Ala.1999) (emphasis added); *see also McDaniel v. Fulton County School Dist.,* 233 F.Supp.2d 1364, 1375 (N.D.Ga.2002) ("If the alleged harasser was *not the plaintiff's supervisor,* and thus did not have any power to take any tangible, adverse employment action against the plaintiff (such as firing or demoting her for rejecting his sexual advances), then the employer may only be held liable for the co-worker's conduct if the employer knew or should have known of the harassment and failed to take prompt remedial action.") (emphasis added). *But see Wyatt v. Hunt Plywood Co., Inc.,* 297 F.3d 405, 411–12 (5th Cir.2002) (finding that the court need not resolve a conflict over the supervisory authority of the alleged harasser, in light of the plaintiff's assertion that the harasser had "authority to direct her daily activities" and the harasser's assertion of his "low wage-earning compensation and his inability to hire or fire those in [the plaintiff's] position," where the defendant had made binding admissions that the alleged harasser was the plaintiff's "supervisor"), *petition for cert. filed,* 71 U.S.L.W. 3366 (Nov. 7, 2002). Thus, it is not simply the supervisor's power, but his ability to exercise that power *over the plaintiff* that determines whether or not he or she is a "supervisor" within the meaning of *Ellerth* and *Faragher*.

These principles are also articulated or demonstrated in additional decisions of the lower federal courts. For example, in *Mikels v. City of Durham, NC*, 183 F.3d 323 (4th Cir.1999), the Fourth Circuit Court of Appeals concluded that a key factor in determining the proper standard for employer liability is whether the alleged harasser had "sufficient supervisory authority over [the plaintiff]," which the court defined in terms of the alleged harasser's degree of control over the victim's conditions of employment:

We know that it cannot be the conduct of a mere co-worker—one having no form of authority over the victim—and that it therefore can only be the conduct of one having some measure of supervisory authority. But, because not all harassment even by "supervisory" employees necessarily qualifies under the "malleable terminology" of this standard, *see id.*, the inquiry may have to run deeper into the details of relationships and particular circumstances. The touchstone, though not a prescription, can be found in critical observations by the *Ellerth* and *Faragher* courts respecting the way in which the agency relation may aid a particular "supervisor" in a particular act of actionable harassment. The determinant is whether as a practical matter his employment relation to the victim was such as to constitute a continuing threat to her employment conditions that made her vulnerable to and defenseless against the particular conduct in ways that comparable conduct by a mere co-worker would not. *See Faragher*, 118 S.Ct. at 2291 (because "victim may well be reluctant to accept the risks of blowing the whistle on a superior ..." [and] "generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a coworker"). The most powerful indicator of such a threat-induced vulnerability deriving from the supervisor's agency relation lies in his authority, though not exercised in the particular situation, to take tangible employment actions against the victim, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *See Ellerth*, 118 S.Ct. at 2268–69 (so defining this level of authority as necessarily derived from the agency relation); *Faragher*, 118 S.Ct. at 2293 (imposing aided-by-agency vicarious liability where no tangible employment action taken but one of two harassing supervisors had authority to hire and fire, both had "virtually unchecked authority" over subordinates, "directly controlling and supervising all aspects of [the victim's] day-to-day activities," and victim and colleagues were "completely isolated from the [employer's] higher management").

Short of that most threatening form of supervisory authority, we may assume, without deciding here, that lesser forms derived from the agency relation may aid particular acts of supervisor harassment. In such less clear circumstances, the victim's response in context maybe highly probative or the issue whether any agency authority possessed by the harasser has actually aided his conduct by increasing her sense of vulnerability and defenselessness. This point was anticipated, though obliquely, in *Faragher*. There the Court noted that "when a fellow-employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor 'whose power to supervise—[which may be to hire and fire], and to set work schedules and pay rates—does not disappear when he chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of

promotion.'" *Id.* at 2291 (quoting Estrich, *Sex at Work,* 43 Stan. L.Rev. 813, 854 (1991)). Which is to suggest that where the level of authority had by a harasser over a victim—hence her special vulnerability to his harassment—is ambiguous, the tip-off may well be in her response to it. Does she feel free to "walk away and tell the offender where to go," or does she suffer the insufferable longer than she otherwise might? *Mikels,* 183 F.3d at 333–34. Thus, like this court, the Fourth Circuit Court of Appeals in *Mikels* derived its definition of supervisory authority sufficient to invoke the *Ellerth/Faragher* standards for employer liability from the Supreme Court's own discussion of what defines the special nature of a supervisor's authority over the victim. *Id.* Still more specifically, like this court, the court in *Mikels* concluded that it is the "authority, though not exercised in the particular situation, to take tangible employment actions against the victim, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits'" that defines a "supervisor" for purposes of *Ellerth/Faragher* liability.

In *Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501 (11th Cir.2000), the Eleventh Circuit Court of Appeals concluded that the alleged harasser was the plaintiff's supervisor, where the harasser and the plaintiff were co-hosts of a morning radio show, but the alleged harasser was also the "program director" for that show. *Johnson,* 234 F.3d at 505 & 511. On the other hand, the court concluded that a remand was required to determine whether or not the alleged harasser was still the plaintiff's supervisor after the plaintiff was transferred to a midday show, then a late night show. *Id.* at 511. The court found that evidence that the alleged harasser scheduled mandatory meetings for the entire staff of announcers during the plaintiff's "air" time, but failed to schedule someone to relieve her so that she could attend those meetings, suggested that the alleged harasser "still wielded some power over [the plaintiff] after she left the Morning Show." *Id.* Thus, the court in *Johnson* considered both the power that the alleged harasser exercised by virtue of his position in the company *and* whether he was able to wield that power directly over the plaintiff.

Still more recently, the Seventh Circuit Court of Appeals made a more extensive analysis of the question of who is a supervisor for Title VII purposes in *Hall v. Bodine Electric Company,* 276 F.3d 345 (7th Cir.2002), as follows:

An employer's liability for hostile environment sexual harassment hinges on whether the harasser is the victim's supervisor or merely a co-employee. *Parkins [v. Civil Constructors of Ill., Inc.],* 163 F.3d [1027,] 1032 [ (7th Cir.1998) ]. "'An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.'" *Id.* (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 745, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). In *Parkins,* we held

it is manifest that the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes [of] imputing liability to the employer.

*Id.* at 1034.

In this case, Hall argues that her harasser, Lopez, qualifies as a Title VII supervisor because he: (1) possessed the authority to direct her work operations (i.e., which machines she ran); (2) provided input into her performance evaluations, and (3) was charged with training her and other less experienced employees. Accepting these attributes as true, as we are required to do in the summary judgment context, none of them is enough to bring Lopez within the definition of a Title VII supervisor—as there is nothing in the record indicating that Bodine entrusted him with the authority to "hire, fire, demote, promote, transfer, or discipline" Hall.

Moreover, the fact that an employer authorizes one employee to oversee aspects of another employee's job performance does not establish a Title VII supervisory relationship. An individual is not a supervisor unless he possesses the authority to directly affect the terms and conditions of a victim's employment. *See, e.g., Haugerud v. Amery School Dist.,* 259 F.3d 678, 696–97 (7th Cir. 2001) (employer may only be held vicariously liable for the acts of those who can be considered the employer's proxy—an individual holding a sufficiently high position in the management hierarchy of the company). The type of marginal discretion Lopez had over Hall's work operations is not sufficient to impute Title VII vicarious liability to an employer. *See, e.g., Parkins,* 163 F.3d at 1034. Additionally, Hall's own actions indicate that she never considered Lopez to be her supervisor. Whenever she had a complaint, she spoke with her actual supervisor (i.e., Steve Conn or Brian Kolka) or the human resources department, not with Lopez or anyone else in his capacity.

*Hall,* 276 F.3d at 355–56 (footnotes omitted). Although the court in *Hall* referred to "authority to affect the terms and conditions of the victim's employment," rather than to the power to take "tangible employment action" against the victim, as the hallmark of a supervisor's power, the specific kinds of authority identified by the court—the "power to hire, fire, demote, promote, transfer, or discipline an employee"—are precisely the same actions that the Supreme Court in *Ellerth* identified as examples of "tangible employment actions." *See Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257. Moreover, the court in *Hall* specifically considered the alleged "supervisor's" power to exercise such authority *over the victim of the alleged harassment. See Hall,* 276 F.3d at 355.

Other decisions are generally in accord with these principles. *See Savino v. C.P. Hall Co.,* 199 F.3d 925, 932 n. 7 (7th Cir. 1999) (holding that "[t]here [wa]s no question that Popper was Savino's supervisor, as he hired her and apparently had the power to terminate her position"); *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1034 (7th Cir.1998) (holding that a supervisor is one with "authority ... of substantial magnitude," such as the power to hire, fire, demote, promote, transfer, or discipline *the plaintiff*); *Dominicak–Brutus v. Urban Property Servs. Co.,* 217 F.Supp.2d 911, 922 (N.D.Ill.2002) (noting that the Seventh Circuit Court of Appeals "adheres to a strict definition of who qualifies as a supervisor under Title VII," citing *Hall,* and holding that the purported alleged harasser's ability to assign the plaintiff work was not sufficient to establish his "supervisory status"); *Pickett v. Colonel of Spearfish,* 209 F.Supp.2d 999, 1006 (D.S.D.2001) (holding that the alleged harasser was not a "supervisor" for purposes of employer liability, because he "lacked the authority to hire, fire, promote, or discipline Colonel employees," but was instead only a "task master"); *Olsen v. H.E.B. Pantry Foods,* 196 F.Supp.2d 436, 439 (E.D.Tex.2002) (taking the Supreme

Court's statement in *Ellerth* that "The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his control." *Ellerth*, 524 U.S. at 762, 118 S.Ct. 2257, as defining supervisory authority, and assuming for purposes of summary judgment that the alleged harasser had such authority, the *Ellerth/Faragher* affirmative defense was applicable); *Jackson v. T & N Van Serv.*, 86 F.Supp.2d 497, 500–02 (E.D.Pa.2000) (examining both *Parkins* and *Mikels* and holding that the harassers lacked supervisory authority, because they did not assign the plaintiff tasks, the plaintiff felt free to confront them about harassing conduct then report it to another person perceived to be his direct supervisor, and the alleged harassers had no role in substantial employment decisions). *But see Dinkins v. Charoen Pokphand USA, Inc.*, 133 F.Supp.2d 1254, 1266 (M.D.Ala.2001) (rejecting the *Parkins* formulation of who is a supervisor for Title VII cases as "appealing because it establishes simple rules for complex cases," but "improperly truncates the Supreme Court's holdings in *Faragher* and *Ellerth*," which "clearly indicate that an analysis of employment relationships involves multifactorial analysis rather than simplistic taxonomy," and instead "find[ing] that an employee is a supervisor or 'agent' for purposes of Title VII if he has the actual authority to take tangible employment actions," *see Ellerth*, 524 U.S. at 762, 118 S.Ct. 2257, 141 L.Ed.2d 633, or to recommend tangible employment actions if his recommendations are given substantial weight by the final decisionmaker, *see id.*, or to direct another employee's day-to-day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks, *see Johnson [v. Booker T. Washington Broadcasting Serv.]*, 234 F.3d [501,] 513 [ (11th Cir. 2000) ].); *Homesley v. Freightliner Corp.*, 122 F.Supp.2d 659, 662–64 (W.D.N.C.2000)

(applying the *Mikels* standard to determine whether the harasser was a "supervisor," noting that the harasser's relationship with the plaintiff "lacked the 'most powerful indicators of ... threat-inducing vulnerability ...,' " because he "had no authority to hire, fire, or discipline any of the other welders"; although he reported to his supervisor regarding their performance, "there was no evidence in the record that he had the power to promote or fail to promote other welders"; and his ability to reassign welders to different tasks did not extend to authority to assign "significantly different responsibilities" or "caus[e] a significant change in benefits," but the case differed from *Mikels*, because "lesser forms" of supervisory authority, and the plaintiff's response to the harassment, suggested that the harasser was nevertheless aided by the agency relationship such that there were genuine issues of material fact as to whether he should be treated as a "supervisor"); *Grozdanich v. Leisure Hills Health Ctr., Inc.*, 25 F.Supp.2d 953, 970–73 (D.Minn.1998) (noting, in the first instance, that the alleged harasser did not appear to be a "supervisor," because he lacked the "plenary" power to hire, advance, dismiss, or discipline the plaintiff, but that there were genuine issues of material fact under "a more indulgent line of cases which, prior to *Faragher* and *Ellerth*, maintained that a low-level supervisor, who retained something less than plenary authority over hiring and firing, could be considered a 'supervisor' such that an employer would be vicariously liable for his acts of sexual harassment," because the harasser was the plaintiff's "first line supervisor," with the authority to control her daily activities and to recommend disciplinary action against her, and he used that authority "to allow him to harass the Plaintiff by sending her to a resident's room, so as to be isolated from

others, in order that he might physically assault her there@").

The court concludes, on the basis of the record presented and applicable law, that Herman Johnson's status as "a foreman," standing alone, is insufficient to make the *Ellerth/Faragher* standards for "supervisor" harassment applicable here. Rather, this court concludes that the alleged harasser must not only be a nominal "supervisor," but must actually exercise *immediate or successively higher* supervisory authority *over the plaintiff,* before the *Ellerth/Faragher* standards for employer liability for the harasser's conduct are applicable. The question is, did Johnson exercise such "supervisory authority over [Joens]"?

**■ ii. Was Johnson such a "supervisor"?** The court cannot find that its attention has been drawn to any evidence that Herman Johnson had such immediate (or successively higher) authority *over Joens.* Rather, the evidence in the record is that Johnson was "a cut floor foreman" with no direct authority over Joens, whose direct supervisor was instead Denny Reitz, although Johnson apparently had authority to request more boxes as needed for his cut floor. For example, Joens indicated in her deposition that she did not think that Johnson was her supervisor, as follows:

> Q Is [Herman Johnson] the supervisor of the box shop?
>
> A I don't really know who is. I thought Denny Reitz was, I don't know.
>
> Q What is Herman Johnson's job?
>
> A He's the foreman down on the cut floor.

Defendant's Appendix at 8 (Deposition of LaDonna Joens at 27, ll. 21–25). Shortly thereafter, Joens testified as follows:

> Q All right. Herman Johnson is a foreman for Morrell?
>
> A Yes, he is.

> Q Would the box shop be under his area of control so far as you know?
>
> A It could be. I don't know.

*Id.* (Deposition of LaDonna Joens at 28, ll. 12–17). On the other hand, in an affidavit submitted in support of John Morrell's motion for summary judgment, Dennis Reitz avers that "I am responsible for supervision of the box shop, the area where LaDonna Joens works. I am also the supervisor primarily in charge of scheduling and approving her overtime hours." *Id.* at 25 (Affidavit of Dennis Reitz at ¶ 3).

The court does not believe that Joens's uncertain deposition testimony is enough to generate a genuine issue of material fact that Johnson was Joens's direct supervisor or one with successively higher authority over her in the face of Reitz's apparently unchallenged averment that he is the supervisor of the box shop and was responsible for scheduling and approving Joens's overtime hours. In other words, the court does not believe that Joens's deposition testimony is a real basis in the record for the proposition that Johnson was Joens's supervisor within the meaning of *Ellerth* and *Faragher. Hartnagel,* 953 F.2d at 394 (explaining that an issue of material fact is "genuine" if it has a real basis in the record, citing *Matsushita Elec. Indus. Co.,* 475 U.S. at 586–87, 106 S.Ct. 1348). Joens has not met her burden to generate a genuine issue of material fact on this issue by designating any other evidence that supports such a contention. FED. R. CIV. P. 56(e) (to defeat a summary judgment motion on a particular issue, the nonmovant must designate "specific facts showing that there is a genuine issue for trial"). In short, nowhere in the record is there any indication that Herman Johnson had the power to inflict "tangible employment action" on the scale of hiring, firing, demoting, promoting, disciplining Joens, or

even the authority to "reassign" her to perform significantly different responsibilities, or to cause a significant change in her benefits, even if he could demand that she do more of her ordinary work—making boxes—as needed for his production line. *See, e.g., Ellerth,* 524 U.S. at 761–63, 118 S.Ct. 2257; *Hall,* 276 F.3d at 355–56; *Johnson,* 234 F.3d at 505 & 511; *Mikels,* 183 F.3d at 333–34.

Moreover, even assuming that "lesser forms" of supervisory authority might suffice, under certain circumstances, to justify application of the *Ellerth/Faragher* standards for employer liability, *see, e.g., Dinkins,* 133 F.Supp.2d at 1266; *Homesley,* 122 F.Supp.2d at 662–64; *Grozdanich,* 25 F.Supp.2d at 970–73, there still is no genuine issue of material fact that the authority exercised by Johnson here is legally sufficient. At most, Joens has pointed to evidence that Johnson could demand that she provide more boxes for his production line and could complain about her performance, to her, and presumably, to other company officials. However, she has pointed to no evidence that he could recommend tangible employment actions, for which his recommendations would be given substantial weight by the final decisionmaker, or to direct her day-to-day work activities in a manner that might increase her workload *beyond the norm* or assign additional or undesirable tasks; instead, his authority was "minimal." *Compare Dinkins,* 133 F.Supp.2d at 1266; *Homesley,* 122 F.Supp.2d at 664 (the harasser had more than "minimal" authority over the plaintiff where he had control over her work assignments and use of vacation and sick time). Nor has she pointed to any evidence that she felt precluded by Johnson's authority over her from complaining about his alleged harassment; to the contrary, she points to evidence that she complained often and loudly about the way Johnson treated her to "higher" company officials. *Compare Homesley,* 122 F.Supp.2d at 664

(considering the extent to which the plaintiff felt free to complain to others, perceived to be her "supervisors," about the conduct of the alleged harasser as indicative of the harasser's supervisory authority over her). Nor has she pointed to any evidence that Johnson used whatever supervisory authority he had over Johnson to place her in a situation where he could subject her to physical assaults in isolation. *Compare Grozdanich,* 25 F.Supp.2d at 970–73.

In the absence of any evidence that Johnson exercised the necessary authority over Johnson to invoke the Ellerth/Faragher standards for employer liability for "supervisor" harassment, the court concludes that the standard for employer liability that is applicable here is the "knew or should have known" standard applicable to "co-worker" harassment. *See Underwood,* 57 F.Supp.2d at 1303–04; *see also Dhyne,* 184 F.3d at 987 (recognizing that this standard of "direct" liability still applied to co-worker harassment after *Ellerth* and *Faragher* ); *accord Rheineck,* 261 F.3d at 755 (elements of a co-worker harassment claim); *Bogren,* 236 F.3d at 407 (same); *Stuart,* 217 F.3d at 631 (same).

### c. Are there genuine issues of material fact under the appropriate standard for employer liability?

In order for a plaintiff's employer to be held liable for harassing conduct of a *co-worker* or, this court concludes, for harassing conduct *of a nominal supervisor with no sufficient supervisory authority over the plaintiff,* the plaintiff must show that her employer knew or should have known of the conduct and failed to take prompt remedial action. *See, e.g., Rheineck,* 261 F.3d at 755 (elements of a co-worker harassment claim); *Bogren,* 236 F.3d at 407 (same); *Stuart,* 217 F.3d at 631

(same); *Dhyne,* 184 F.3d at 987 (recognizing that this standard of "direct" liability still applied to co-worker harassment after *Ellerth* and *Faragher*). Joens contends that she "repeatedly" complained to John Morrell managers or supervisors and union shop stewards about "harassment" by Johnson. Consequently, she contends that she has, at a minimum, generated genuine issues of material fact that John Morrell either knew or should have known of the sexual harassment by Johnson. However, John Morrell contends that it was not until Joens filed her administrative charge of discrimination that John Morrell had any idea that Joens was complaining that Johnson's "harassment" was "based on sex."

In light of the circumstances presented here, the second "burning" question before the court is this: Is the plaintiff required to complain about harassment "based on sex" before the employer is required to consider whether alleged harassment of a female employee by a male employee is discriminatory? Corollaries of this question, the court believes, are the following: (a) What constitutes sufficient notice to an employer that alleged "harassment" is or may be based on a protected characteristic? (b) Is an employer under any sort of obligation, based on superior knowledge of the requirements of the law or any other basis, to consider whether alleged harassment of a female employee by a male employee may be "based on sex" (or whether, to give another example, harassment of a black employee by a white employee may be "based on race")? (c) Is there any "magic words" requirement for an employee to put an employer on notice that alleged harassment is "based on sex" or some other protected characteristic?

***i. What constitutes sufficient notice that alleged harassment is "based on sex"?*** The Eighth Circuit Court of Appeals recently considered such questions in

*Jacob–Mua v. Veneman,* 289 F.3d 517 (8th Cir.2002). In that case, the plaintiff "reported to her supervisor the incident in which a co-worker argued with [her], yelled at her, and threw keys at her." *Jacob–Mua,* 289 F.3d at 523. Nevertheless, the court concluded that the plaintiff failed to establish that the employer "knew or should have known" that the harassment *was racially motivated. Id.* The court explained:

> While the key-throwing incident *may have been racially motivated,* in Jacob–Mua's report of the incident to her supervisor, *she did not declare, indicate, or even imply that the altercation had anything to do with race.* The same co-worker who threw the keys also repeatedly asked Jacob–Mua invasive and arguably racial questions "about being black" such as "how often she wash[ed] her hair," and "how much does it cost to braid [her] hair." This co-worker told Jacob–Mua "slavery wasn't all that bad" and repeatedly interrogated Jacob–Mua with offensive questions like "[W]hen are [you] leaving?" and "[W]hen are [you] going back to Africa?" *However, Jacob–Mua never informed her supervisor or other management of these questions.* She also did not present evidence her supervisors were aware of this harassment. Evidence exists that, with respect to Jacob–Mua's hiring, Bratton stated "I have to accept a black woman as an employee that I don't even want." In a later coffee room conversation, on a work day when Jacob–Mua was wearing traditional African clothing, Bratton or another employee said, after Jacob–Mua left the room, "that was some dress," and each laughed. However, no evidence connects these comments to any hostile work environment created by Bratton or otherwise allowed to exist by the USDA. During the relevant time period, Jacob–Mua never submitted any written or oral report to her employer

indicating she was the victim of any *racial* harassment. Furthermore, the record does not indicate her supervisor or employer should have known of any racial harassment. Absent evidence in the record indicating her employer or supervisor knew or should have known of racially harassing conduct, Jacob–Mua does not have a viable co-worker hostile work environment claim.

*Jacob–Mua,* 289 F.3d at 523 (emphasis added).

 At first blush, *Jacob–Mua* appears to answer the questions posed by the court just above, suggesting that, although there may not be a specific set of "magic words" to put an employer on notice that harassment is based on a specific protected characteristic, there is at least a "magic formula" to do so. This is the case, because the court in *Jacob–Mua* considered, first, whether the plaintiff had "declare[d], indicate[d], or even impl[ied] that the [complained of conduct] had anything to do with" a protected characteristic, in that case, race. *Id.* Thus, this court must first consider whether Joens ever "declare[d], indicate[d], or even impl[ied] that the [complained of conduct] had anything to do with [sex]." *Id.* However, in *Jacob–Mua,* the court *also considered* whether the plaintiff had reported certain incidents that, at least "arguably," would have disclosed a racial animus, which the court catalogued as "questions 'about being black' such as 'how often she wash[ed] her hair,' and 'how much does it cost to braid [her] hair,'" comments like "'slavery wasn't all that bad,'" and other patently "offensive questions" like "'[W]hen are [you] leaving?' and '[W]hen are [you] going back to Africa?'" *Id.* Thus, in light of *Jacob–Mua,* this court concludes that sufficient notice may also be given that harass-

ing or offensive conduct is based on a protected characteristic *if the circumstances reported "arguably" suggest a discriminatory animus,* even in the absence of the employee's specific declaration, indication, or implication that the conduct complained of has anything to do with a protected characteristic. By "arguably," this court assumes that, in the context of a summary judgment motion, the Eighth Circuit Court of Appeals in *Jacob–Mua* meant evidence that a reasonable jury could find would have suggested to an employer that a discriminatory animus was afoot. *See id.* (considering appeal of district court's grant of summary judgment, and noting, *inter alia,* that "[s]ummary judgment should be cautiously granted in discrimination cases because such cases often depend on inferences rather than on direct evidence").

Such a standard is, in this court's view, in keeping with the burden on an employer to notify employees of the employer's prohibition, pursuant to Title VII, of discriminatory, harassing, or retaliatory conduct and the means for complaining about such prohibited conduct, as well as the employer's burden to demonstrate that the employer is willing and able to respond appropriately to such reports. These burdens on the employer are embodied, for example, in the second prong of the "knew or should have known" element of employer liability for co-worker harassment, which considers whether the employer took "prompt remedial action." *See, e.g., Rheineck,* 261 F.3d at 755 (elements of a co-worker harassment claim); *Bogren,* 236 F.3d at 407 (same); *Stuart,* 217 F.3d at 631 (same); *Dhyne,* 184 F.3d at 987 (recognizing that this standard of "direct" liability still applied to co-worker harassment after *Ellerth* and *Faragher*).[2] A

---

**2.** It is also embodied, in the context of "supervisor" harassment, in the prongs of the *Ellerth/Faragher* affirmative defense. *See,*

*e.g., Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257 (examining the adequacy of the employer's antiharassment policy and implementation of

burden on an employer to inform employees that harassment will not be tolerated and to have workable means in place to prevent or correct harassment suggests, in this court's view, recognition that *employers*, rather than *employees*, are the parties charged by law with superior knowledge of what Title VII prohibits.[3]

**■ ii. Was sufficient notice given here?** In the present case, the court cannot find that Joens has designated any "specific facts showing that there is a genuine issue for trial," *see* FED. R. CIV. P. 56(e) (the non-movant's burden), on the issue of whether Joens ever specifically "declare[d], indicate[d], or even impl[ied] that the [Johnson's harassment] had anything to do with [sex]." *See Jacob–Mua*, 289 F.3d at 523. For example, the court has not been directed to any evidence that Joens so much as told John Morrell managers or supervisors or her union shop stewards that Herman Johnson regularly harangued and abused her, *but did not treat male box shop employees that way.* On the other hand, Joens plainly reported incidents of a *male* employee frequently haranguing and abusing a *female* employee. Nevertheless, the court does not believe that such a gender difference between the persons involved is, standing alone, sufficient to make the incidents "arguably" gender influenced. If this court were to hold that it was sufficient to report any incident of workplace conflict between a member of a protected class and a person not in that class (such as conflict between a black worker and a white worker, an old worker and a young worker, a Jewish worker and a Christian worker, etc.) to put an employer on notice of possible discrimination in violation of Title VII,

then Title VII would become nothing more that "a general civility code for the American workplace," which the Supreme Court has held that it was not meant to be. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

Furthermore, the description of the incidents in this case did not disclose any gender-based animus as patently, or even "arguably," as the unreported comments and questions in *Jacob–Mua* disclosed a racial animus. Indeed, the parties here appear to agree that Herman Johnson's tirades, however abusive, were in gender-neutral terms. This case would probably be different if, hypothetically, Johnson's tirades had included comments like "I don't know why they let a woman do your job!", "Why do they let a f___ing bitch like you try to do this job?", or "Why don't you just stay home and make babies instead of trying to make boxes?," and Joens had reported such comments. *See Jacob–Mua*, 289 F.3d at 523 (concluding that "questions 'about being black' such as 'how often she wash[ed] her hair,' and 'how much does it cost to braid [her] hair,'" comments like "'slavery wasn't all that bad,'" and other patently "offensive questions" like "[W]hen are [you] leaving?' and '[W]hen are [you] going back to Africa?'" at least "arguably" suggested a racially discriminatory animus, but that the plaintiff had failed to report them).

While Herman Johnson's tirades may have been unjustified, or if justified, may have been couched in unjustifiably rude and vicious terms, Joens has not met her burden to generate a genuine issue of material fact that John Morrell either knew

that policy); *Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275 (same).

**3.** This burden on the employer to prevent and correct unlawful discrimination is not to be confused with the burden on *the plaintiff* to prove that the employer knew or should have known of the harassment but failed to take prompt remedial action.

or should have known that Johnson's conduct was gender-motivated. "Absent evidence in the record indicating her employer or supervisor knew or should have known of [sexually] harassing conduct, [Joens] does not have a viable co-worker hostile work environment claim." *Jacob-Mua*, 289 F.3d at 523. Therefore, the portion of John Morrell's motion seeking summary judgment on Joens's hostile environment claim in Count I of her Complaint will be granted.

### C. The Disparate Treatment Claim

### 1. Arguments of the parties

John Morrell has also moved for summary judgment on Joens's disparate treatment claim. Although Joens identified in her Complaint several respects in which she claims that she was discriminated against on the basis of her sex, *see* Complaint, Count II, ¶ 25(a)-(e), the parties have focused their arguments concerning this claim almost exclusively on the question of whether Joens was discriminated against on the basis of her sex in the number of overtime hours that she was allowed to work as compared to her male counterpart on the evening shift.[4]

John Morrell contends that Joens cannot generate a genuine issue of material fact that she suffered an adverse employment action or that men were not subjected to the same actions about which she complains. Moreover, John Morrell contends that it has identified legitimate, non-discriminatory reasons for the actions it took, and Joens cannot generate genuine issues of material fact that those reasons are merely a pretext for sex discrimination. Somewhat more specifically, John Morrell argues that Joens suffered no adverse employment action as to overtime hours, even

though Severson the box machine operator on the evening shift, worked more overtime hours than Joens did in 1999, 2000, and 2001, because Joens had worked more overtime hours than Severson in 1997 and 1998, and the two worked virtually identical overtime hours in 2002 after John Morrell corrected Severson's "unauthorized" overtime. Next, John Morrell contends that Joens cannot generate any evidence rebutting John Morrell's legitimate reason for any overtime disparity, which was that Severson was working unauthorized overtime. Moreover, John Morrell contends that Joens's attempts to show pretext and discriminatory animus fail, because she cannot establish that she was similarly situated in all relevant respects to Severson, who worked a different shift, with different demands, under a different supervisor, while Joens herself worked more overtime than a male box shop employee, Heuton, on her shift. At oral arguments, John Morrell summarized its arguments for summary judgment on this claim as a contention that there is a complete lack of evidence of sex discriminatory animus in the record.

In response, Joens asserts that it is uncontroverted that a similarly situated male employee, Doug Severson, worked significantly more overtime hours than she did *for three years*. She contends that this court rejected the "shift differences" argument asserted by John Morrell in a recent decision in *Baker v. John Morrell*, 220 F.Supp.2d 1000, 1016 (N.D.Iowa 2002). Thus, she contends that the real fighting issue is whether John Morrell's assertions of legitimate, nondiscriminatory reasons for the overtime disparity are pretextual. She contends that inferences of pretext

---

**4.** John Morrell also challenges Joens's disparate treatment claim premised on her allegations in her Complaint that John Morrell failed to provide her with a helper, even though her male counterpart on the evening shift had such a helper. However, Joens did not respond to John Morrell's arguments in this regard in her response to the motion for summary judgment.

arise from the fact that John Morrell allowed the disparity in overtime to go uncorrected for years, despite Joens's frequent complaints about it, undercutting John Morrell's contention that mere oversight permitted Severson to work unauthorized overtime. Indeed, she testified in deposition that John Morrell managers and supervisors became so tired of her complaints about the overtime disparity that they told her to stop bothering them about it.

John Morrell's reply brief was devoted entirely to Joens's sexually hostile environment claim, so that the court need not summarize any reply regarding the disparate treatment claim.

### 2. Joens's prima facie case

█ As the parties have correctly stated, in the absence of direct evidence of discrimination,

[the court must] evaluate [a disparate treatment claim] under the burden shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of unlawful discrimination, after which the defendant has the burden of articulating a legitimate nondiscriminatory reason for its action, following which the plaintiff has the burden of producing sufficient evidence to allow a reasonable factfinder to conclude that the defendant's asserted reason is not the true, legitimate reason but a pretext for discrimination. [The court must] bear in mind that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

*Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 683 (8th Cir.2002). As the parties also recognize, the elements of Joens's *prima facie* case of disparate treatment based on sex are the following: (1) she is a member of a protected class; (2) she was qualified to receive the benefit in question; (3) she was denied that benefit, that is, she suffered an adverse employment action; and (4) there exists some evidence that gives rise to an inference of gender discrimination. *Simmons v. New Public School Dist. No. Eight*, 251 F.3d 1210, 1214 (8th Cir.2001); *Schoffstall v. Henderson*, 223 F.3d 818, 825 (8th Cir. 2000).

█ Notwithstanding that John Morrell has pointed to evidence that Joens worked more overtime hours than Severson in 1997 and 1998, and the two worked almost identical overtime hours in 2002, the court concludes that Joens has generated genuine issues of material fact that she was denied a benefit allowed to Severson or, to put it another way, that she suffered an adverse employment action, in the denial of comparable overtime hours in 1999, 2000, and 2001. It seems clear to the court that denial of overtime hours, and hence overtime pay, would constitute an adverse employment action. As the Eighth Circuit Court of Appeals has explained,

"An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Spears v. Missouri Dep't of Corr. and Human Res.*, 210 F.3d 850, 853 (8th Cir.2000) (citation omitted). "Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard ...." *Id.* (citation omitted).

*Gagnon v. Sprint Corp.*, 284 F.3d 839, 850 (8th Cir.), *cert. denied*, — U.S. —, 123 S.Ct. 485, 154 L.Ed.2d 396 (2002). Denial

of overtime directly deprives an employee of compensation that the employee would otherwise have earned, *i.e.*, it causes a reduction in pay. *See, e.g., Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir.2002) (so holding, citing *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1118 (11th Cir.2001)). Whether Joens had herself worked more overtime hours than Severson during prior years goes to the legitimacy of John Morrell's explanation for the hours disparity during the challenged years, not to whether or not an adverse employment action occurred. Moreover, the fact that a male employee in the same job on an opposite shift worked more overtime hours during the challenged period is sufficient, for purposes of a *prima facie* case, to generate the necessary inference of gender discrimination to satisfy the last challenged element of Joens's *prima facie* case of disparate treatment. *Simmons*, 251 F.3d at 1214; *Schoffstall*, 223 F.3d at 825.

### 3. Joens's showing of pretext

John Morrell asserts that it has a number of legitimate reasons for any overtime disparity, including differences between shifts, but that the primary legitimate reason is that the excess overtime hours worked by Severson, the male comparator, were not "authorized." Moreover, John Morrell contends that Severson is not "similarly situated," so that no proper comparison can be made. Joens counters that this court has rejected the "shift differences" upon which John Morrell relies and that other evidence of pretext includes the fact that John Morrell allowed the disparity in overtime hours to exist for several years despite her frequent complaints.

In *Baker v. John Morrell & Co.*, 220 F.Supp.2d 1000 (N.D.Iowa 2002), this court explained that, "[w]hile instances of disparate treatment may support an inference of pretext, to prove disparate treatment, the plaintiff must show that he or she was 'similarly situated in all relevant respects' to a non-member of the protected class who was more favorably treated." *Baker*, 220 F.Supp.2d .at 1015 (quoting *Cronquist v. City of Minneapolis*, 237 F.3d 920, 927 (8th Cir.2001)). Although " '[t]he test for whether employees are similarly situated to warrant a comparison to the plaintiff is "rigorous," ' " *id.* (again quoting *Cronquist*, 237 F.3d at 927, in turn quoting *Harvey v. Anheuser– Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994)), this court concluded that comparisons to a person of the opposite sex who "performed the same job as [the plaintiff] ... generally on shifts opposite to [the plaintiff]" presented a proper comparison for purposes of summary judgment. *Id.* at 1016. The court does not retreat from that conclusion here. Rather, in the circumstances presented here, the differences that John Morrell focuses on between Severson and Joens go to the legitimacy of differences in treatment, not to whether or not Severson and Joens were "similarly situated." John Morrell's attempt to compare Joens to another male box shop employee on her own shift, Mr. Heuton, on the other hand, is not proper, because there is no showing that Heuton "performed the same job as [Joens]," where he was not a box machine operator.

Finally, therefore, the court turns to the issue of whether Joens has generated genuine issues of material fact that, notwithstanding John Morrell's purported legitimate, non-discriminatory reasons for the disparity in overtime hours, the real reason is a sex discriminatory animus. *See Edmund*, 299 F.3d at 679 ("[The court must] bear in mind that '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' ") (quoting *Burdine*, 450 U.S. at 253). Indeed, as the Supreme Court recently explained in

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), a showing that the employer's proffered reason is not "the real reason" is not enough. *Reeves,* 530 U.S. at 153, 120 S.Ct. 2097. Rather, what the plaintiff's evidence must show, to avoid summary judgment or judgment as a matter of law, is " '1, that the stated reasons were not the real reasons for [the plaintiff's] discharge; and 2, that age [or race, or sex, or other prohibited] discrimination was the real reason for [the plaintiff's] discharge." *Id.* (quoting the district court's jury instructions as properly stating the law). The Supreme Court clarified in *Reeves* that, to meet this burden, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. 2097. Thus, a plaintiff must show, or at least generate a genuine issue of material fact, that the defendants' justification for their conduct is "unworthy of credence." *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 833–34 (8th Cir.2002) (citing *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097). While a prima facie case may be strong enough, standing alone, to make this showing, that is not always the case, and unlike the plaintiff's *prima facie* case, the evidence purportedly demonstrating pretext is " 'viewed in light of the employer's justification.' " *Id.* at 835 (quoting *Sprenger v. Federal Home Loan Bank,* 253 F.3d 1106, 1111 (8th Cir.2001)).

The court agrees that Joens has designated evidence that generates genuine issues of material fact that John Morrell's assertions that it was unaware of the overtime disparity are not worthy of belief. *See* FED. R. CIV. P. 56(e) (the non-movant's burden is to designate "specific facts showing that there is a genuine issue for trial"). Specifically, her deposition testimony is that she repeatedly complained to compa-

ny officials and union shop stewards about the overtime disparity over the extended period of time that it was occurring, but John Morrell did nothing to rectify the disparity. However, it is the second requirement under *Reeves* to avoid summary judgment that is fatal to Joens's disparate treatment claim. She has designated no evidence beyond her very weak *prima facie* case of a disparity with a similarly situated male that suggests that *her sex* was the "real reason" for the disparity in light of the evidence of John Morrell's proffered legitimate reason. *Reeves,* 530 U.S. at 153, 120 S.Ct. 2097; *Smith,* 302 F.3d at 835. Again, the court has found no evidence in the record that Joens's complaints to John Morrell officials and union stewards about the disparity were ever cast in terms that would have notified John Morrell that Joens believed that the disparity was *between men and women,* rather than between herself and the person working the same job on a different shift, *until she filed her administrative charge of discrimination.* The undisputed evidence that John Morrell thereafter corrected the problem also undermines any suggestion of discriminatory animus arising from the *prima facie* case standing alone. Thus, the court finds no evidence generating an inference of "discriminatory animus." *See id.* at 153, 120 S.Ct. 2097 (the plaintiff must generate genuine issues of material fact as to both pretext and that the real reason is discriminatory animus).

Therefore, John Morrell's motion for summary judgment on Joens's disparate treatment claim in Count II of her Complaint will also be granted.

### D. Retaliation

#### 1. Arguments of the parties

██ Finally, John Morrell seeks summary judgment on Joens's retaliation claim. John Morrell again argues that Joens cannot point to any adverse employment action taken against her in support

of this claim, because she suffered no change in title, salary, or benefits, and any overtime disparity was corrected once John Morrell discovered that Severson was working unauthorized overtime hours. John Morrell again asserts that there is a lack of any evidence of retaliatory animus on the record presented here. On the other hand, Joens relies on essentially the same evidence that supports her disparate treatment claim as demonstrating that there are genuine issues of material fact on her retaliation claim, arguing that the denial of equal overtime hours was retaliatory. Joens argues that she can generate an inference of retaliatory intent based on evidence that John Morrell allowed the overtime disparity to persist during the same period that she was complaining about harassment and the overtime disparity. That temporal proximity, she contends, is sufficient to suggest retaliatory intent.

### 2. Joens's showing in support of her retaliation claim

■ As the Eighth Circuit Court of Appeals recently explained,

"Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3, makes it unlawful for an employer to discriminate against an employee, for among other things, 'because [s]he has opposed any practice made an unlawful employment practice by this subchapter.'" *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 713 (8th Cir.2000) (alteration in original) (quoting 42 U.S.C. § 2000e–3). Absent direct evidence of discrimination invoking the mixed-motive analysis of *Price Waterhouse*, the burden-shifting analysis of *McDonnell Douglas* applies to claims of retaliation. *Buettner*, 216 F.3d at 713.

To establish a prima facie case of retaliatory discrimination, a plaintiff must show: (1)[she] engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection existed between participation in the protected activity and the adverse employment action. *Id.* at 713–14 (citations omitted).

*Gagnon*, 284 F.3d at 849–50. John Morrell challenges, first, the second element of Joens's *prima facie* case of retaliation, the "adverse employment action" element, in its motion for summary judgment, but John Morrell also asserts that, even assuming a *prima facie* case of retaliation can be generated, there is still no evidence of retaliatory animus for the same reasons that there was no evidence of discriminatory animus in support of Joens's disparate treatment claim.

For the reasons stated above, as to Joens's disparate treatment claim, the court concludes that Joens has generated genuine issues of material fact that she suffered adverse employment action in the form of denial of overtime hours that is sufficient to support her retaliation claim. Also for much the same reason that the record here contained no evidence of discriminatory animus beyond the weak *prima facie* case of disparate treatment, there is likewise no evidence of retaliatory animus, either. Until John Morrell had notice that Joens was complaining that harassment and the overtime disparity were *because of sex*, John Morrell could not have been retaliating for conduct protected by Title VII, even if John Morrell's failure to respond to Joens's complaints was in "retaliation" for Joens's repeated complaints about harassment and the overtime disparity.[5] Joens's argument that the

---

**5.** To put it another way, John Morrell would be entitled to summary judgment on the *first* and *third* elements of Joens's *prima facie* case

of retaliation, that Joens engaged in protected activity and that any adverse employment ac-

record demonstrates retaliatory animus based on the purported temporal proximity of the protected activity and the allegedly retaliatory conduct thus fails where there was no notice to John Morrell that her complaints were protected activity until she notified John Morrell that she believed that the harassment and overtime disparity were because of sex. The only evidence in the record is that, once Joens notified John Morrell that she believed that the harassment and overtime disparity were because of sex, by filing her administrative charge of discrimination, John Morrell took action to correct the conduct in question.

Thus, John Morrell is also entitled to summary judgment on Joens's retaliation claim.

### III. CONCLUSION

For the reasons stated above, John Morrell's motion for summary judgment is **granted in its entirety.** More specifically, John Morrell is entitled to summary judgment on Count I of Joens's complaint, her claim of a sexually hostile work environment, based on Joens's failure to generate any genuine issues of material fact that John Morrell either knew or should have known about the harassment. Joens failed to generate a genuine issue of material fact that she either declared, indicated, or even implied that the gender-neutral tirades by Herman Johnson, which she asserted were harassing, had anything to do with her sex, or that she reported tirades that were cast in such terms that they "arguably" suggested a gender-based animus. John Morrell is also entitled to summary judgment on Counts II and III of Joens's Complaint, her disparate treatment and retaliation claims, because Joens

has failed to generate genuine issues of material fact that John Morrell took any adverse employment action against her on the basis of discriminatory or retaliatory animus.

Because no viable claims remain, judgment shall enter in favor of John Morrell.

**IT IS SO ORDERED.**

tion was because of that protected activity, where John Morrell could not have known that Joens's complaints were "protected activity" and retaliated for that "protected activity," until Joens notified John Morrell that she believed harassing or disparate treatment were because of sex.