# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3732

_____

Pamela Weyers,                              *
                                            *
            Plaintiff/Appellee,             *
                                            *
      v.                                    *
                                            *  Appeal from the United States
Lear Operations Corporation, doing          *  District Court for the
business as Lear Corporation,               *  Western District of Missouri.
                                            *
            Defendant/Appellant,            *
                                            *
_____                        *
                                            *
Equal Employment Opportunity                *
Commission,                                 *
                                            *
            Amicus on Behalf of             *
            Appellee.                       *

_____

Submitted:  May 14, 2003

Filed:  February 24, 2004

_____

Before WOLLMAN and BEAM, Circuit Judges, and NANGLE,[1] District Judge.

_____

[1]The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

WOLLMAN, Circuit Judge.

Pamela Weyers sued her former employer, Lear Operations Corporation (Lear), alleging that she had been discriminated against on the basis of her age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. §§ 213.010-213.137. A jury found in her favor and awarded Weyers more than one million dollars in damages on her harassment and termination claims. The district court denied Lear's motion for judgment as a matter of law or, in the alternative, for a new trial, but granted Lear's request for remittitur. Judgment was entered in the amount of $718,962. Lear appeals, raising numerous grounds for relief. We reverse and remand for new trial.

## I. Background

Lear operates an assembly plant in Liberty, Missouri, where it produces vehicle seats for Ford Motor Company. Lear's Liberty facility has a unionized workforce, and, pursuant to the union contract, Lear's new employees are subject to a ninety-day probationary period.

Lear hired Weyers, who was then 43 years old, on November 29, 1999. Weyers was assigned to work the night shift in the Liberty facility's "rear department," which operated two rear seat production lines. Lear's management hierarchy consisted of a night shift superintendent, night shift supervisors for each department or area, and team leaders, who assisted the supervisors. The team leader was responsible for assigning tasks on the assembly line and for ensuring that the line ran according to schedule. A union employee, the team leader was paid forty cents more per hour than other assembly line workers. When Weyers was hired, the night shift superintendent was Tony Mendez. The night shift supervisor for the rear department was initially Matt Smith, who was later replaced by Bill Courteville. Ben

-2-

Brosius was Weyers's first team leader. He was removed from that position in mid-January 2000 because of objections from the Union that as a junior employee he should not have been permitted to bid for the position of team leader.

Night shift superintendent Mendez explained the "just-in-time" production schedule that Lear had with Ford, describing it as a "two-hour window between us and Ford. . . . [T]he seats we're building for that day will be put in the trucks that day. . . . [I]t's very key for the [production] lines to keep moving. . . . One seat can hold up a load. . . . I'll have them, basically, down my throat . . . . My boss being called and his boss and even into corporate . . . ."

Night shift supervisor Courteville echoed Mendez's description of the "just-in-time" production schedule, adding that Lear was subject to a financial penalty if its failure to meet Ford's seat requirements resulted in halting Ford's production line. In a word, then, the continuous, timely production of called-for seats was essential to Lear's ability to comply with the terms of its contract with Ford.

From all accounts, Brosius was an aggressive team leader, exhorting his co-employees by loud, sometimes profane (e.g. "move your asses"), language to complete their assigned tasks quickly. Accordingly, to one employee, "Ben bugged everybody. . . . He was always yelling at people, telling them speed up and everything. Not really picking on anybody." In night shift supervisor Courteville's words, "Ben was an aggressive guy. He attacked the job, whatever job he was on. Ben outbuilt anybody in any area he was ever in."[2]

---

[2]Brosius was terminated by Lear in November 2000 after having been subjected to Lear's four-step progressive discipline program. Two of the steps were based upon Brosius's too-rapid rate of production. ("[H]e overbuilt his product and stacked it on the floor, which . . . cause[d] quality problems . . . ." After being suspended for horseplay (throwing a pair of gloves at another employee), Brosius was discharged for fighting with another employee.

Weyers testified that Brosius began making age-based comments about her "early in [her] employment with Lear," "almost immediately." Weyers explained that most of these comments were made when Brosius was talking with other employees and she was nearby. According to Weyers, several co-workers advised her that they, too, had overheard Brosius make ageist remarks directed at her. Weyers also testified that Brosius treated her differently from the way he treated younger employees, both in terms of training and work assignments. Several of Weyers's co-workers corroborated her testimony regarding the ageist comments, inadequate training, and differential treatment. One co-worker testified that the comments had occurred "multiple times."[3]

Mendez conducted written reviews of Weyers's performance in January and February of 2000, recording his evaluations on a Hire Plan Progress Report. This report indicated that Brosius had conducted three prior reviews of Weyers's performance.

On February 25, 2000, shortly before the conclusion of Weyers's ninety-day probationary period, Mendez terminated her employment, citing her poor performance. Shortly thereafter, Weyers filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Missouri Commission on Human Rights. After exhausting her administrative remedies, Weyers brought suit in the United States District Court for the Western District of Missouri, alleging age and sex discrimination in violation of both federal and state law. The district court

_____

[3]The alleged ageist comments included references to Weyers and other female employees as "old bitch." One of Weyers's witnesses testified that Brosius said to him and four other co-workers referring to Weyers, "[T]hat old bitch ain't going to make her 90 days." Weyers testified that Brosius said, "I hate that old bitch," and "[I]f you're over 25, you're female, you're out of here. You don't work for me. You don't work in my department."

granted Lear's motion for summary judgment on Weyers's sex discrimination claims, and the age discrimination claims proceeded to trial.

While cross-examining Weyers, Lear's counsel sought to impeach her with her prior sworn statement to the EEOC. Weyers objected, and the district court prohibited Lear from using the prior statement. Noting that it also included references to the sex discrimination claims that were no longer part of the case, the district court concluded that the statement would confuse the jury by "mix[ing] up the gender and the age discrimination issue."

The jury returned a verdict against Lear, finding that Weyers had been subjected to harassment because of her age and terminated because of her age. On the harassment claim, the jury awarded $125,000 in actual damages and $500,000 in punitive damages. On the termination claim, the jury awarded $68,962 in actual damages and $125,000 in punitive damages. The punitive damage awards were made pursuant to the MHRA. The jury also found Lear's conduct to be willful with respect to both the harassment and termination claims. This finding entitled Weyers to liquidated damages equal to her actual damages, pursuant to 29 U.S.C. § 626(b).

After the verdict was rendered, Lear moved for judgment as a matter of law or, in the alternative, for a new trial. Although it rejected most of Lear's post-trial arguments, the district court agreed that remittitur was appropriate. Noting that the jury was not informed as to the consequences of its willfulness finding, the court recognized that "the ADEA liquidated damages may [have] be[en] duplicative of the MHRA punitive damages." Thus, the court ordered remittitur on the harassment claim in the amount of $225,000, which was equal to the ADEA liquidated damages plus $100,000 of the MHRA punitive damage award. On the termination claim, the court ordered remittitur in the amount of $68,962, which was equal to the ADEA

liquidated damages. Weyers accepted remittitur, and judgment was entered in the amount of $718,962.[4] This appeal followed.

## II. Analysis

As one might expect in a hard-fought trial of this nature, the evidence was sharply conflicting on the principal issues of fact. Weyers and her witnesses portrayed her as a conscientious employee, willing to work and eager to learn. Lear's witnesses described Weyers as a lackadaisical worker at best, slow in her work and slow in returning to work after breaks, and more concerned about the condition of her fingernails than about the quality and quantity of her work product.

### A. Exclusion of Evidence

Lear contends that the district court erred by prohibiting it from impeaching Weyers with her prior sworn statement to the EEOC. This statement, which both parties refer to as Exhibit 36, includes an EEOC Questionnaire and a typewritten attachment, both of which were prepared by Weyers. Lear contends that the events described in this statement are materially different in number and degree from her trial testimony. Thus, Lear argues, it was entitled to inform the jury of what it characterizes as the "convenient evolution of [Weyers's] story" and that it suffered severe prejudice as a result of the district court's ruling.

In denying Lear's motion for a new trial, the district court concluded that the EEOC statement was properly excluded under Federal Rule of Evidence (Rule) 403,

---

[4]This award was broken down as follows: actual damages in the amount of $125,000 and punitive damages in the amount of $400,000 on the harassment claim; actual damages in the amount of $68,962 and punitive damages in the amount of $125,000 on the termination claim.

which permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The court also determined that even if the statement had been erroneously excluded, the error did not affect Lear's substantial rights.

There is no doubt that the EEOC statement was relevant to the issue of witness credibility. See Arnold v. Groose, 109 F.3d 1292, 1297 (8th Cir. 1997) ("To have evidentiary value for its inconsistency, the contradiction need not be direct. 'The cases have developed a standard of minimal inconsistency, under which almost any divergence will suffice to permit use of the prior statement.' 'It is enough if the proffered [statement] taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict.'" (citations omitted) (alterations in original)). In its post-trial order, the court explained that Exhibit 36 was excluded not on relevancy grounds, but because of concerns with the first page of the typewritten attachment, which indicated that Weyers was treated differently from the three men in her training class. According to the court, it "did not want to confuse the jury with the sex discrimination claims given that summary judgment had already been granted on those claims, and did not want to admit an exhibit that contained an EEOC Charge." Thus, the court concluded, exclusion was necessary "to prevent unfair prejudice and confusion."

Based on our review of Exhibit 36, we respectfully disagree with the district court's analysis, for we see little potential for unfair prejudice or jury confusion. We see no reason why the district court could not have instructed the jury that Exhibit 36 was being admitted only with respect to Weyers's allegations of age discrimination and not for any other purpose. Likewise, we see no reason why the admission of Exhibit 36 would have required an extensive discussion of the EEOC complaint

-7-

process or the admission of "all other documents submitted to the EEOC," as Weyers contends. Thus, any resulting delay occasioned by the admission of the exhibit would have been minimal.

In light of the diametrically conflicting testimony presented by the parties, we agree with Lear that the inconsistencies between Weyers's testimony and her EEOC statement would have borne directly on her credibility. Thus, the probative value of the statement would not have been substantially outweighed by the danger of unfair prejudice, jury confusion, or undue delay. Accordingly, while recognizing the substantial deference that should be afforded a district court's Rule 403 ruling, we conclude that the court erred in excluding the EEOC statement.

This conclusion does not end our inquiry, however, for "[a]n abuse of discretion will . . . constitute reversible error [only] if it affects a substantial right of the party challenging the ruling." Williams v. Wal-Mart Stores, Inc., 922 F.2d 1357, 1360 (8th Cir. 1990) (citing Fed. R. Evid. 103(a), Fed. R. Civ. P. 61) (additional citations omitted).

We agree with Lear that the exclusion of Weyers's EEOC statement was prejudicial to its defense. The questionnaire is dated March 2, 2000, approximately one week after Weyers's termination from Lear, and the typewritten attachment was presumably prepared about the same time. On the first page of the typewritten attachment, Weyers explained that she began working for Lear on November 29, 1999, and that Lear closed the Liberty facility from December 24, 1999, to January 3, 2000, for the holidays. She stated that "[u]p until [January 3, 2000,] I was bran [sic] new with the Company and did not notice alot [sic] of negative things going on." Her only complaint was that she was singled out from the rest of her training class

and assigned to the kitting department,[5] while the others in her class were afforded "on the job training" to build seats. "This is basically the first thing and all I really noticed until I returned to work from Christmas vacation on January 3rd. After returning January 3rd, 2000, this is when things really started to happen." In the typewritten attachment, Weyers mentioned only two specific occasions on which Brosius made age-related comments, both of which occurred after January 3, 2000.

By contrast, at trial, more than one and one-half years after her termination, Weyers testified that the harassment was continuous from the very beginning of her employment. For example, when relating occasions on which co-workers told her of ageist comments made by Brosius, Weyers testified that "[t]hese remarks came from Ben Brosius's mouth early in my employment with Lear. I would say within [sic] just almost immediately. I would say within just a couple days." When questioned about events that occurred on a particular date during her employment, Weyers asserted that "[the harassment was] an everyday thing. You know it happened about every day." Even more specifically, Weyers testified at trial about incidents of harassment that occurred prior to January 3, 2000. She testified that on December 1, 1999, she requested and was denied training on the assembly line. She stated that on December 6, Brosius pulled her off her job and directed her to unload trucks. She testified that on December 8, she looked up as she was working and saw Brosius "giving [her] the finger, just flipping [her] off," and that later that night, Brosius yelled and screamed at her as she walked across the parking lot toward her car.

We recognize that Weyers presented several witnesses who corroborated her testimony regarding her inadequate training and others who confirmed that Brosius had made ageist comments. To that extent, her case is different from the situation in

---

[5]Workers in the kitting department were responsible for taking the computer orders for specific seats and bringing the appropriate seat covers to the assembly line where the seats were built.

Arnold, where the evidence in support of the claim rested solely on Arnold's credibility. Nevertheless, we agree with Lear that "the jury was entitled to hear the different accounts [Weyers] had given . . . in order to address her credibility," as "[t]he number and intensity of the incidents of discrimination go to the heart of the issues to be decided by the jury." See Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1158 (8th Cir. 1999) ("Harassment based on an individual's . . . age, in violation of the ADEA, is actionable when that harassment is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment. To be actionable, harassment must be both objectively and subjectively offensive . . . ." (internal quotation marks and citations omitted)); see also Carter v. Chrysler Corp., 173 F.3d 693, 701 (8th Cir. 1999) ("All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus." (citations omitted)). The opportunity of presenting to the jury the evidence bearing on witness credibility was of special importance in the present case, given the relatively short time that Weyers had worked for Lear and the size of the verdict that was returned. Indeed, in its order granting the remittitur, the district court observed that "[i]n the absence of this remittitur, the amount of Plaintiff's judgment would be a 'plain injustice' or a 'shocking result.'" (Citing Slatton v. Martin K. Eby Constr. Co., 506 F.2d 505, 508 (8th Cir. 1974); Morse v. Southern Union Co., 174 F.3d 917, 925 (8th Cir. 1999).) In sum, "[i]t is not possible to 'say with certainty that the jury's decision would have been the same,'" as to the finding of liability or the amount of damages on the age-harassment claim, had Lear been permitted to use the EEOC statement during its cross-examination of Weyers. Nichols v. Am. Nat'l Ins. Co., 154 F.3d 875, 890 (8th Cir. 1998) (citations omitted).

Our analysis applies with equal force with respect to Weyers's age-based termination complaint, for that claim was based in large part on her allegation that Brosius, by virtue of his alleged status as Weyers's supervisor, was responsible for the unfavorable evaluation scores that resulted in Weyers's termination. Absent that

basis of liability, the evidence in support of age-based discrimination on Mendez's part was not so overwhelming that it rendered the testimony regarding Brosius's conduct superfluous or of merely incidental force. As the district court noted in its post-trial order, Weyers failed to produce any direct evidence of a discriminatory attitude on Mendez's part, leaving her with litle more than a showing that three of the four individuals terminated during Weyers's tenure were over the age of forty.

B.   Ben Brosius's Status

Because this case must be retried, we proceed to consider the question of Ben Brosius's status, for Lear's liability for harassment depends in large part on whether Brosius was Weyers's supervisor or merely a co-employee. See, e.g., Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1998). The district court concluded as a matter of law that while employed as a team leader, Brosius was Weyers's supervisor. We conclude that the district court erred in so ruling.

In Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998), the United States Supreme Court determined that an employer may be subject to vicarious liability for a hostile work environment when a "supervisor with immediate (or successively higher) authority over the employee" has engaged in the alleged harassment.[6]  The Court, however, "did not further explain what it meant by 'supervisor.'" Todd v. Ortho Biotech, Inc., 175 F.3d 595, 598 (8th Cir. 1999). In its post-trial order, the district court noted that

_____

[6]Hostile work environment claims, whether based on age or sex, are analyzed under the same general framework. See, e.g., Breeding, 164 F.3d at 1158-59. "Our analysis is [also] the same for both the state and federal claims because decisions under the various federal employment discrimination statutes are applicable and authoritative under the Missouri Human Rights Act as well as federal law." Id. at 1156 (quoting Finley v. Empiregas, Inc. of Potosi, 975 F.2d 467, 473 (8th Cir.1992)).

this court has not yet elaborated on the concept of supervisory status. The court then concluded that there was no need "to precisely define the term 'supervisor,'" in this case, as "it [was] clear to the [c]ourt that Brosius was Weyers['s] supervisor during part of her employment with Lear."

Lear urges us to construe the term supervisor narrowly, citing in support the Seventh Circuit's decision in Parkins. The EEOC, as amicus curiae, asks that we adopt the broader view of supervisory status set forth in Mack v. Otis Elevator Co., 326 F.3d 116 (2d Cir. 2003).

Our option of adopting the broader Mack definition of supervisory status has been foreclosed by the recent decision of another panel of this court in Joens v. John Morrell & Co., 354 F.3d 938 (8th Cir. 2004), in which the court adopted the narrower standard of supervisor liability set forth in Hall v. Bodine Elec. Co., 276 F.3d 345, 355 (7th Cir. 2002); and Mikels v. City of Durham, 183 F.3d 323, 333-34 (4th Cir.1999). Under that view, to be considered a supervisor, "the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties." Joens, 354 F.3d at 940.

Weyers testified that Brosius refused to add her to the "rotation" of jobs on the assembly line, thereby hampering her training. Weyers also testified that when she attempted to "self-train" by joining the rotation on her own, Brosius pulled her off the line. These allegations, combined with Brosius's alleged ageist comments, were the foundation of Weyers's harassment claim. See, e.g., Carter, 173 F.3d at 701 ("All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus." (citations omitted)); Bowen v. Mo. Dep't of Soc. Servs., 311 F.3d 878, 884 (8th Cir. 2002) (concluding that because alleged harasser's two "white bitch" epithets "carried clear racial overtones, they permit[ted] an

inference that racial animus motivated not only [the harasser's] overtly discriminatory conduct but all of her offensive conduct towards [the plaintiff]" (citations omitted)).

Although Brosius had the authority as team leader to assign employees to particular tasks, he could not reassign them to significantly different duties. While it is true that Brosius signed at least three of Weyers's initial performance evaluations and that Tony Mendez acknowledged that he had based his decision to terminate Weyers at least in part on Weyers's job evaluation scores, Brosius himself did not have the authority to take tangible employment action against Weyers. As was the case in Joens, he could not hire, fire, promote, or discipline employees within his department.[7] Accordingly, we conclude that in light of the definition set forth in Joens, the evidence does not support the district court's finding that Brosius was in fact Weyers's supervisor.[8]

### III. Other Issues

In light of our holding that the case must be remanded for new trial, we need not consider Lear's contentions that the district court erred in several other evidentiary rulings. Likewise, implicit in our holding is our rejection of Lear's contention that the evidence was insufficient to warrant submission of the case to the jury.

---

[7]Mendez testified that team leaders such as Brosius were viewed by the employees as supervisors. Under our holding in Todd v. Ortho Biotech, Inc., however, Brosius's apparent authority would be an insufficient basis to support a finding of supervisor status. 175 F.3d at 598.

[8]We note that in moving for a new trial, Lear argued that the issue of whether Brosius was a supervisor presented a question of fact that should have been submitted to the jury. Lear has not pursued this argument on appeal, and thus we decline to address the question.

-13-

## IV. Conclusion

The judgment is reversed, and the case is remanded to the district court for new trial.

_____