**Teresa SOTO, Plaintiff,**

v.

**JOHN MORRELL & COMPANY, Defendant.**

**No. C02–4029–MWB.**

United States District Court, N.D. Iowa, Western Division.

May 3, 2004.

Jay Elliott Denne, Stanley E. Munger, Munger, Reinschmidt & Denne, Sioux City, IA, for Plaintiff.

Barry Bach, Leslie R. Stellman, Hodes, Ulman, Pessin & Katz, PA, Towson, MD, Scott C. Folkers, John Morrell & Co., Sioux Falls, SD, for Defendant.

### MEMORANDUM OPINION AND OR-DER REGARDING DEFEN-DANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 982
 A. *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 982
 B. *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 984

II. LEGAL ANALYSIS ..................................................987
 A. Authority For Reconsideration ...................................987
 B. Summary Judgment Standards ..................................988
 C. Supervisor Status ............................................989
 1. Recent Eighth Circuit decisions .............................989
 2. Arguments of the parties ..................................989
 3. Analysis ................................................990

III. CONCLUSION ..................................................992

## I. INTRODUCTION

### A. Factual Background

The court has already given a detailed synopsis of the alleged factual incidents leading to the filing of this case when it took up the defendant's initial motion for summary judgment in *Soto v. John Morrell & Co.*, 285 F.Supp.2d 1146, 1153–58 (N.D.Iowa 2003) (*"Soto I"*), and therefore it will not engage in a whole-hearted regurgitation of those facts here. Rather, only a summary of the facts, from which the basic events and cast of characters can be gleaned, is necessary here.

Plaintiff Teresa Soto ("Soto") was employed with defendant John Morrell & Company ("John Morrell") on two occasions, the first from December 30, 1997 through March 26, 1998, and the second from December 2000 through July 21, 2001. The incidents giving rise to this matter occurred during Soto's second period of employment. While Soto alleges that the sexual harassment at John Morrell was profuse, most of her allegations stem from the conduct of the second-shift superintendent of the "kill floor," Leonard Tanner ("Tanner"). Soto also alleges some sporadic sexually harassing conduct on the part of the second-shift "supervisors" working under Tanner: Mike Hartman ("Hartman"), Jose Valdivia ("Valdivia"), and Jesus Perez ("Perez"). There are also allegations that the second-shift supervisors, on various occasions, acquiesced or partook in harassment instigated by Tanner. In *Soto I*, the court summarized the allegations as follows:

- While working on kidneys, which required the worker to be 2–3 feet up off the ground and work with knives, Tanner would come up behind Soto to stare at her. On a couple of occasions Tanner grabbed her calves from behind.

- On a number of occasions, Mr Tanner would 'throw' the plaintiff kisses, and repeatedly offer her his phone number.

- While she was working 'scissors,' Tanner took her hand to lead her down from the line, and held her hand while they crossed the work floor to an office.

- On one occasion, Soto saw supervisor Mike Hartman grab a female employee by the hips, lay her on one of the tables, and simulate intercourse. The response on the kill floor was one of laughter and encouragement.

- The day after Soto had been sent home for her high blood pressure, Tanner was angry with her. A female co-employee, speaking from personal experience, recommended giving Tanner a hug and a kiss would solve Soto's problems. Soto refused to hug or kiss Tanner.

- Sometime after March 2001, while Soto was working at the strapper, Tanner, foreman Mike Hartman, and co-worker Jose Vasquez, approached her and Mr. Tanner told her to "say yes." Mr. Hartman gestured to her to say "no." At the time Soto said "yes." Later Soto approached Mr. Hartman and asked what she had said 'yes' to. Mr. Hartman informed her that she had

agreed that she gave Tanner blow jobs every night. Defendant's App., Doc. No. 31 at 000026–000028.

● In March 2001, after Soto was sent home for her high blood pressure, Tanner yelled at her: "You better give me a damn report on your health, and if you don't, don't come back." Defendant's App., Doc. No. 31 at 000032. When Soto asked her physician, Dr. Ann Pick, for the health report Tanner requested, Dr. Pick responded that the information was "personal. What, is he going to want to know your periods next too?" Defendant's App., Doc. No. 31 at 000032.

● On a couple of occasions Tanner would come up behind Soto and untie her apron.

● Tanner had a habit of discussing how he liked 'eating pussy all night long' in front of numerous female workers. Defendant's App., Doc. No. 31 at 000140.

● On occasion, Tanner would reach out towards Soto and wiggle his fingers while saying "muy bueno panoche."[1] Tanner would also exhibit this behavior and language towards other females. Defendants' App., Doc. No. 31 at 000130.

● While working on the line, Tanner once held up a pig's penis and told Soto that it was for her.

● USDA worker Dale had a habit of coming up to female workers, including Soto, and doing one of the following three things: (1) Telling the female employee that she liked to "get eaten out"; (2) yelling "all night long"; or (3) looking at the female workers while sticking out his tongue and wiggling it around.

Defendant's App., Doc. No. 31 at 0000217.

● At the end of June 2001, Tanner saw a hickey on the back of Soto's neck. Tanner yelled to the foreman and USDA workers on the other side of the kill floor that Soto had a hickey. Further, Tanner asked her how she got a hickey on the back of her neck, and if she did it 'doggie style.' Tanner continued to comment on how she had done it 'doggie style,' while another foreman yelled "yea doggie style must have been good." Defendant's Appendix, Doc. No. 31 at 000218. Tanner continued to make these comments to her for the next several weeks.

*Soto I*, 285 F.Supp.2d at 1155–56.

In March 2001, Soto approached Human Resources Director Steve Joyce ("Joyce") about obtaining a transfer from the kill floor to another area. Soto did not disclose any of the alleged harassment, and only stated that she wanted a transfer because Tanner was mean to her. Joyce denied Soto's request for a transfer as Soto had not given him a compelling reason necessesitating a transfer outside of the bidding out process.[2] Soto approached Joyce about a transfer again in May or June of 2001. Soto's stated reasons for the transfer were that she was "uncomfortable" and Tanner was mean to her. Using the same rationale as before, Joyce responded that a transfer outside of the bidding process was unavailable absent a compelling reason.

On July 17, 2001, Soto left the state to attend to a family emergency. Soto wrote

---

**1.** "Muy bueno panoche" and "muy bueno panocha" are Spanish slang for "really good pussy" or "very beautiful pussy." Defendant's App., Doc. No. 31 at 000147.

**2.** Once an hourly worker has achieved more than 90–days of service, absent extraordinary

circumstances, a transfer can only be effectuated by bidding out. Defendant's Appendix, Doc. No. 31 at 00000173. When Soto approached Joyce on this first occasion she had already achieved more than 90–days of service.

a note to Joyce and Kerry Abel, a John Morrell Human Resources Manager, explaining the situation and stating that she didn't know how long she would be gone. The note also requested that they give her check to her co-worker, and live-in boyfriend, Antonio ("Tony") Gonzalez. Within the next few days, Gonzalez went to get Soto's check from Tanner. Allegedly, Tanner told Gonzalez that Soto was fired and that she could get her check when she came in to return her equipment. Gonzalez conveyed this information to Soto. On July 23, 2001, after Soto returned from attending to her family emergency, she met with Kerry Abel about her employment. At this time, Abel told Soto that Tanner did not have the authority to fire anybody, and offered Soto reinstatement to her former position with back-pay, seniority and benefits. Soto accepted the offer of reinstatement at the time. Soto did *not* tell Abel of any of Tanner's alleged harassment. The next day Gonzalez called Abel and told him that Soto was not returning to work due to Tanner's sexual harassment of Soto. Officially, Soto's last day at John Morrell was July 26, 2001.

On August 13, 2001, Joyce received a handwritten letter from Soto setting forth a number of allegations of harassment by Tanner. Joyce immediately called Soto and asked her to come in and discuss the allegations made in her letter. Following this discussion, Joyce directed Abel to conduct an investigation of the allegations. Abel commenced his investigation on that very day. Abel's investigation consisted of interviewing Tanner, three of the second-shift kill floor supervisors—Perez, Hartman and Jim Cates ("Cates"), and some of Soto's co-workers. Tanner categorically denied all of the allegations. Interviews of the other individuals did not corroborate Soto's allegations. Tanner was spoken to about unprofessional conduct stemming from an allegation that he was not on the kill floor enough, but otherwise no other action was taken at the time.

On August 30, 2001, Joyce met with Soto and two union representatives to discuss the outcome of the investigation and to offer Soto reinstatement to a different area of the plant away from Tanner, with seniority and benefits. Soto refused this offer.

On November 5, 2001, Soto filed a charge of discrimination with the Iowa Civil Rights Commission ("ICRC"), which was cross-filed with the Equal Employment Opportunity Commission (EEOC). Shortly thereafter, John Morrell received a copy of Soto's formal charge. Following acquisition of the ICRC complaint, Joyce met with Dan Paquin, General Manager and Vice President of John Morrell, and Tanner to discuss the allegations in the charge. Tanner changed his story from his previous interview, and admitted to some of the alleged conduct. Paquin placed Tanner on administrative leave. Joyce then re-interviewed Perez, Hartman and Valdivia, as well as a number of Soto's coworkers. Shortly thereafter, Tanner was terminated. On November 29, 2001, John Morrell again made Soto, through her attorney, an unconditional offer of reinstatement. The offer stated that Tanner had been terminated, and offered Soto a position in any area of the plant, on any shift, at the same pay, seniority and benefit level as when she left. Neither Soto or her attorney responded to this offer.

### B. Procedural History

On March 16, 2002, Soto filed a complaint in this court against John Morrell, alleging four causes of action: (1) a claim of sexual harassment in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.;* (2) a claim of racial harassment and discrimination in violation of Title VII and § 1981; (3) a claim

of retaliation; and (4) pendent state law claims under the Iowa Civil Rights Act ("ICRA"), IOWA CODE CH. 216. Soto filed an amended complaint on June 25, 2003, which added the additional claim of *quid pro quo* sexual harassment. On August 4, 2003, John Morrell filed a Motion for Summary Judgment which asserted that summary judgment was appropriate on all of the plaintiff's claims. (Doc. No. 31). Oral argument on John Morrell's motion was held on September 30, 2003. (Doc. No. 52). At oral argument John Morrell conceded that Tanner, the alleged key harasser, was a "supervisor" with "immediate (or successively higher) authority" over Soto. *Soto I,* 285 F.Supp.2d at 1160. Accordingly, the court applied the analytical framework appropriate for a supervisor in reaching its summary judgment conclusions.

On October 6, 2003, this court entered a Memorandum Opinion and Order Regarding Defendant's Motion for Summary Judgment (Doc. No. 53) which denied John Morrell summary judgment on Soto's claims of sexual harassment and *quid pro quo* harassment under the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.,* and under the Iowa Civil Rights Act ("ICRA"), IOWA CODE CH. 216, but granted summary judgment on Soto's claims of racial discrimination and retaliation. *Id.* at 1179–80. With regard to the sexually hostile work environment claim, John Morrell did not attack the plaintiff's ability to establish a *prima facie* case, but rather asserted that it was entitled, as a matter of law, to the *Ellerth/Faragher* affirmative defense.[3] Specifically, John Morrell contended that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and

that Soto unreasonably failed to take advantage of any preventative or corrective opportunities provided by John Morrell. *Id.* at 1158–59. However, the affirmative defense is not available where the harassment by a supervisor resulted in a tangible employment action. *See Joens v. John Morrell,* 243 F.Supp.2d 920, 932 (N.D.Iowa 2003) (*"Joens I"*) ("Thus, in the wake of *Ellerth* and *Faragher,* an employer is subject to vicarious liability for harassment by a supervisor, if that harassment resulted in a "tangible employment action," but the employer's liability for harassment by a supervisor is otherwise contingent upon an affirmative defense."). Soto asserted two manners in which tangible employment action was taken against her: (1) Tanner threatened to fire, and eventually did terminate, Soto; and (2) Tanner gave longer bathroom breaks to those employees that acquiesced to his harassment. The court held that Tanner's threats to terminate, and purported 'firing' of Soto did not amount to a tangible employment action:

> Unquestionably, Tanner's mere threats to fire Soto do not rise to the level of a tangible employment action as Soto did not suffer a fiscal or employment related injury because of them. As far as Tanner's termination of Soto, the record suggests that this too fails to rise to the level of a tangible employment action. It is uncontested that Tanner did not have actual authority to fire Soto, or anyone else for that matter. The hiring and firing of employees was allocated exclusively to John Morrell's Human Resources Department. It is true that the record indicates that Tanner told Gonzalez that Soto was fired, that Soto believed she was fired, and that Soto's

---

3. The *Ellerth/Faragher* analysis is *only* appropriate where the plaintiff seeks to hold the employer vicariously liable for the harassment of a *supervisor. See Burlington Indus. Inc. v.*

*Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

belief that she was fired was reasonable based on Tanner's apparent authority. However, at the time Soto found out about her 'termination' she was attending to a family emergency in Michigan. The day after her return to Iowa, she went into John Morrell's Human Resources office and requested her check from Kerry Abel. At this time, Soto was informed that Tanner had no authority to terminate her, that she was still employed at John Morrell with the same benefits and seniority, and that she could come back to work the next day. Soto discovered she was not terminated on the exact same day she would have normally returned to work following her absence. Given the timing of events detailed in the record, the court cannot say that Tanner's 'termination' resulted in Soto suffering a significant change in employment benefits rising to the level of a tangible employment action. *See Buettner v. Arch Coal Sales, Inc.,* 216 F.3d 707, 715 (8th Cir.2000), *cert. denied,* 531 U.S. 1077, 121 S.Ct. 773, 148 L.Ed.2d 672 (2001) (finding no adverse employment action where employee was told she was fired by a supervisor, but did not lose pay or other job benefits). *Soto I,* 285 F.Supp.2d at 1160. As to Soto's contention that the denial of bathroom breaks constituted a tangible employment action, after reviewing the record evidence the court held that though it was a close call, the plaintiff had generated a genuine issue of material fact:

> The apparently conflicting testimony in the record, and the ambiguous and difficult to understand testimony of the plaintiff makes the determination of whether a tangible employment action occurred at the hands of John Morrell a very close call. However, in a motion for summary judgment the court is required to view the facts in the light most favorable to the nonmoving party, in this case plaintiff Soto. Looking at the facts in the light most favorable to Soto, the court finds that a genuine issue of material fact has been raised as to whether the denial of bathroom breaks, or whether giving Soto exponentially shorter bathroom breaks than other female co-workers on the same line, constituted tangible employment action.

*Id.* at 1162. As to Soto's *quid pro quo* sexual harassment claim, the court found that genuine issues of material fact had been raised as to whether Tanner requested sexual favors and/or made sexual advances towards her, and as to whether the denial or giving of shorter bathroom breaks constitutes a tangible job detriment. *Id.* at 1173–75. Following the court's order, only Soto's sexually hostile work environment and *quid pro quo* harassment claims under Title VII and the ICRA remained.

On October 16, 2003, John Morrell made a timely Motion to Amend Judgment under Federal Rule of Civil Procedure 59(e), which asserted that the court made a manifest error of law in failing to grant summary judgment as to Soto's sexual harassment claims under the ICRA. (Doc. No. 55). Specifically, John Morrell contended that in order to establish a sexual harassment claim under the ICRA the plaintiff must show that the employer "knew or should have known" of the alleged harassment, and that there was no basis in the record for the court's conclusion that John Morrell should have been aware of the harassment as Soto "complained directly to Tanner, as well as to her direct supervisors, some of whom had engaged in sexually harassing the plaintiff." *Soto I,* 285 F.Supp.2d at 1179. On October 23, 2003, the court, operating again under the parties assertion that Tanner and the other individuals involved were Soto's "supervisors," filed an order which pointed to spe-

cific record evidence that generated a genuine issue of material fact as to whether John Morrell "knew or should have known" of the harassment, and denied John Morrell's Motion to Amend Judgment. (Doc. No. 58).

On April 14, 2004, John Morrell filed a Memorandum in Support of Its Motion for Leave to File Renewed Motion for Summary Judgment and Request for Expedited Relief. (Doc. No. 70). Specifically, John Morrell asserted that the Eighth Circuit Court of Appeals's decisions in *Joens v. John Morrell & Co.*, 354 F.3d 938 (8th Cir.2004) ("*Joens II* ") and *Weyers v. Lear Operations Corp.*, 359 F.3d 1049 (8th Cir. 2004) called into question Tanner's classification as a "supervisor," thus calling into question the analytical framework under which the plaintiff's remaining claims for sexually hostile work environment and *quid pro quo* harassment should be analyzed. Finding that John Morrell had made a *prima facie* showing of a controlling change in law, the court granted its motion, and given the impending trial date, instituted an expedited briefing schedule on the matter. (Doc. No. 71). John Morrell timely filed its Renewed Motion for Summary Judgment on April 21, 2004. (Doc. No. 73). Soto filed her timely resistance on April 28, 2004 (Doc. No. 77). A jury trial in this matter is currently set to begin on May 17, 2004. The matter is now fully submitted and ready for determination by the court.

## II. LEGAL ANALYSIS

### A. Authority For Reconsideration

■ Before embarking on an analysis of the grounds upon which John Morrell's renewed motion for summary judgment rests, the court must first delineate the authority upon which it reconsiders its denial of summary judgment as to Soto's sexually hostile work environment and *quid pro quo* harassment claims under Title VII and the ICRA.

Federal Rules of Civil Procedure 59(e) and 60(b), which provide for alteration and amendment of judgment and relief from a judgment, respectively, by their express terms apply only to final judgments or final orders. See FED. R. CIV. P. 59(e) ("Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment"); FED. R. CIV. P. 60(b) ("On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons ...") A denial of summary judgment, however, is not a final order. *Miller v. Schoenen*, 75 F.3d 1305, 1308 (8th Cir.1996) (orders denying summary judgment "are not final orders in the traditional sense"); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1362 n. 6 (8th Cir.1993) ("A denial of summary judgment is not a final order ...."); *See also Lincoln Benefit Life Co. v. Edwards*, 160 F.3d 415, 416 (8th Cir.1998) (holding that a denial of summary judgment is not a final order); *Otey v. Marshall*, 121 F.3d 1150, 1154 (8th Cir.1997). Notwithstanding, courts retain the power to reconsider and revise an interlocutory order, such as an order denying summary judgment, up until the time a final judgment is entered. *See, e.g., Myers v. Moore Eng'g, Inc.*, 42 F.3d 452, 455 (8th Cir.1994) ("In federal court, the denial of summary judgment is an interlocutory order that may be reconsidered at any time."); *Fayetteville Inv. v. Commercial Builders*, 936 F.2d 1462, 1469 (4th Cir.1991) ("An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment.")

*Longstreth v. Copple*, 189 F.R.D. 401, 403 (N.D.Iowa 1999); *see also Helm Fin. Corp.*

*v. Iowa N. Ry. Co.*, 214 F.Supp.2d 934, 999 (N.D.Iowa 2002) (citing *Longstreth* for the principle that "courts retain the power to reconsider and revise an order *denying* summary judgment, . . ., up until the time a final judgment is entered."); *Dishman v. Am. Gen. Assurance Co.*, 193 F.Supp.2d 1119, 1123 (N.D.Iowa 2002) (same). Thus, the court has the authority to reconsider the partial denial of John Morrell's motion for summary judgment.

### B. Summary Judgment Standards

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part*, 202 F.3d 1035 (8th Cir.2000), *cert. denied*, 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd*, 205 F.3d 1347, 2000 WL 84400 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim . . . is asserted . . . may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon. . . . *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to

which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377 (same). With these standards in mind, the court turns to consideration of the defendant's renewed motion for summary judgment on the plaintiff's claims.

### C. Supervisor Status

The court first addresses the threshold issue of the proper "status" accorded to the alleged primary harasser—Leonard Tanner ("Tanner").

#### 1. Recent Eighth Circuit decisions

 Two recent Eighth Circuit Court of Appeals's decisions could impact the appropriate classification of Tanner as a "supervisor" or a "co-worker"—*Weyers v. Lear Operations Corporation*, 359 F.3d 1049 (8th Cir.2004) and *Joens v. John Morrell & Co.*, 354 F.3d 938 (8th Cir.2004) ("*Joens II*"). In *Joens II*, the Eighth Circuit Court of Appeals adopted the position espoused by *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir.2002), *Mikels v. City of Durham*, 183 F.3d 323, 333–34 (4th Cir.1999), and this court in *Joens I*, 243 F.Supp.2d at 934–41, which defines a "supervisor" in the following narrow manner:

> to be a supervisor, the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as

the authority to hire, fire, promote, or reassign to significantly different duties. *Joens II*, 354 F.3d at 940. In *Joens II*, the Eighth Circuit affirmed this court's grant of summary judgment because the alleged harasser, while a supervisor of another area of the defendant's facility, had no supervisory authority over the plaintiff. *Id.* at 940–41. In *Weyers v. Lear Operations Corporation*, 359 F.3d 1049 (8th Cir. 2004), the Eighth Circuit Court of Appeals reiterated its adoption of the narrower definition of a supervisor, and applied this narrower definition to the case at hand. *Id.* at 1057. Specifically, the court held that a harasser that "had the authority as team leader to assign employees to particular tasks, [but] could not reassign them to significantly different duties" or "hire, fire, promote or discipline employees within his department" did not meet the definition of a "supervisor." *Id.*

#### 2. Arguments of the parties

Predictably, John Morrell points to the recent Eighth Circuit Court of Appeals's opinions in *Joens* and *Weyers* to support a conclusion, as a matter of law, that Tanner was *not* Soto's supervisor. In support of its position, John Morrell submits the affidavit of Dan Paquin, the General Manager and Vice President of John Morrell. Paquin's affidavit avers that neither Tanner, Hartman or Valdivia "had the authority to hire, fire, or promote [Soto]," and that hiring and firing of hourly employees is a task exclusively allocated to the "Human Resources Department, namely by Steve Joyce." John Morrell & Co's Supplemental Appendix to Its Brief in Support of Its Renewed motion for Summary Judgment ("Def.'s Supp.App."), Doc. No. 73, at 278. Further, Paquin asserts that while Tanner, Hartman and Valdivia had the authority to temporarily assign hourly workers, such as Soto, to different positions on the kill floor, they did not have the authority to perma-

nently reassign anyone to a new position. *Id.* at 279. According to Paquin, permanent reassignment of Soto "would be done through the union bid process and through the [Human Resources] Department, over which Tanner had no control." *Id.* Finally, Paquin avers that "neither Tanner, Hartman, or Valdivia are considered 'upper management,'" nor do they "participate in policy decisions affecting the management of the Sioux City facility." *Id.* In summary, because Tanner, Hartman and Valdivia were not "actual authority to hire, fire or promote Soto", John Morrell claims that they cannot be considered "supervisors" under the recent Eighth Circuit decisions.

Soto argues that because the court has already found a genuine issue of material fact as to whether the denial of bathroom breaks, or giving of shorter bathroom breaks, constituted a tangible employment action—Tanner should still be considered a supervisor, as a tangible employment action cannot be taken absent the use of power "aided by the agency relation." *Mikels v. City of Durham,* 183 F.3d 323, 332 (4th Cir.1999). Further, Soto points out that under John Morrell's argument only two people, Steve Joyce and Dan Paquin, out of the nearly 1,300 plant employees would be considered supervisors—a result that is clearly absurd, and one that is not prescribed by *Weyers* or *Joens II.* Soto asserts that Tanner was the one that directed her day-to-day activities, and that she rarely, if ever, even saw Joyce or Paquin on the kill floor. Finally, Soto contends that while Tanner may not have actually had the authority to fire employees, he had the *de jure* power to do so as a superintendent and that he was aided by the agency relation to John Morrell in exercising this *de jure* power. For all of these reasons, Soto contends that a genuine issue of material fact exists as to whether or not Tanner is a supervisor,

which renders the remainder of John Morrell's arguments for summary judgment moot and warrants denial of the motion in its entirety.

### 3. Analysis

Examination of the arguments and evidence presented by the parties on this issue is akin to reading two divergent factual accounts of the same event. John Morrell has submitted evidence that Tanner did not have the authority to hire, fire, promote or permanently reassign Soto to another job on the kill floor. Nor, according to John Morrell, was Tanner considered "upper management"—as he did not participate in the policy decisions affecting the management of the Sioux City facility. Rather, under John Morrell's restrictive definition of a "supervisor," only two individuals—Steve Joyce and Dan Paquin— "supervised" the nearly 1,300 employees at the Sioux City facility.

On the other hand, Soto contends that she had seen Tanner fire people in the past and believed that he had the authority to do so when he fired her:

> I seen Tanner fire people, and they get so scared they just go. I seen him do that. I used to interpret for him. I used to—I mean, I've seen him do that, and I said I'm fired, I'm fired, you know.

Defendant's App., Doc. No. 31, at 60–61. Soto also points to the following deposition testimony of Steve Joyce to refute John Morrell's claim that Tanner was not a management employee:

> A: Prior to [Tanner] being a superintendent on the kill floor he was a supervisor on the kill floor.
>
> Q: Is a superintendent a management employee?
>
> A: Yes.
>
> Q: So it's not union?
>
> A: Correct.

Q: So superintendent's management, supervisor's management. What's the difference between a supervisor and a superintendent?

A: A superintendent has charge and responsibility over a number of other supervisors.

Q: When Teresa Soto complained about Mr. Tanner's conduct was he a superintendent?

A: Yes, he was.

Plaintiff's Appendix to Brief in Support of Plaintiff's Resistance to Defendant's Renewed Motion for Summary Judgment, Doc. No. 77, at 120 ("Plaintiff's Supp. App."). Finally, in support of her resistance to John Morrell's renewed motion for summary judgment, Soto attached a newly executed affidavit in which she states that Tanner assigned her to different positions on the kill floor for up to two months each, that she believed he had the authority to permanently reassign her to different positions on the kill floor, and that her pay was directly affected by which position she was assigned to by Tanner. *See* Plaintiff's Supp.App. at 124 ("I received five cents for each 'bracket' that I was assigned to by Tanner. For example, in the stick hole I was paid for nine brackets (for a total of 45 cents)."). Finally, Soto asserts that it was *always* Tanner, or a supervisor working underneath him such as Hartman or Valdivia, that directed her

day to day activities—not Steve Joyce or Dan Paquin. Plaintiff's Supp.App. at 124.

On summary judgment the court is required to view the facts in the light most favorable to the nonmoving party—in this case, plaintiff Soto. The definition of a "supervisor" adopted by the Eighth Circuit is not so narrow as to warrant, as a matter of law, a finding that Tanner was not Soto's supervisor. The definition reads:

[T]o be considered a supervisor, "the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, *such as* the authority to hire, fire, promote or reassign to significantly different duties."

*Weyers*, 359 F.3d at 1057 (quoting *Joens II*, 354 F.3d at 940) (emphasis added). In contradiction to the position espoused by John Morrell, the definition does *not* give an exclusive list of the types of significant job events an individual must have authority over in order to be a "supervisor"—rather, the definition merely gives a non-exhaustive sampling of the types of activities that would qualify as tangible employment actions. In the usual case, "a supervisor's harassment involves misuse of actual power, not the false impression of its existence." *Ellerth*, 524 U.S. at 759, 118 S.Ct. 2257, 141 L.Ed.2d 633. This case is, therefore, unusual in the sense that the record demonstrates Tanner's misuse of both actual, and apparent,[4] authority. In terms of apparent au-

---

**4.** The Eighth Circuit in *Weyers*, after finding that the alleged harasser failed to meet the newly adopted definition of a "supervisor," stated, in *dicta*, that the mere fact that the employees viewed the alleged harasser as a "supervisor"—the harasser's apparent authority—was not enough to accord him supervisor status. *See Weyers*, 359 F.3d at 1057 n. 7 ("Brosius's apparent authority would be an insufficient basis to support a finding of supervisor status."). The *Weyers* court relied on *Todd v. Ortho Biotech, Inc.*, 175 F.3d 595 (8th Cir.1999) as foundation for this conclusion.

In *Todd*, the key issue was whether the district court had accurately instructed the jury as to vicarious liability in light of the availability of the affirmative defenses provided for by the then recently decided *Ellerth* and *Faragher* decisions. The court determined that the vicarious liability instruction was inadequate in light of *Ellerth/Faragher* as it did not ask the jury to determine certain facts central to the possible application of the newly developed affirmative defenses, and that the plaintiff's hostile work environment claim should

thority, the record demonstrates that Tanner exercised his apparent authority to permanently reassign, and even fire, Soto. Soto's affidavit confirms this fact—she stated that she unequivocally, and reasonably, believed that Tanner had the authority to both permanently reassign her and fire her—even though John Morrell, and Tanner himself, later conceded that Tanner did not possess the actual authority to perform these actions. *See* Plaintiff's Supp.App. at 123–24. There is also evidence that Tanner had the actual authority, which he exercised, to both control the frequency and duration of Soto's bathroom breaks, and to control her pay to some extent by assigning her to different positions on the kill floor. Clearly, viewing the facts in the light most favorable to Soto, a jury could reasonably conclude that Tanner was in fact her "supervisor" under the definition adopted by *Weyers* and *Joens II.* As a genuine, triable, issue of material fact has been raised as to whether Tanner is a supervisor, summary judgment is not appropriate at this juncture.

### III. CONCLUSION

As the plaintiff has generated a genuine issue of material fact as to whether her alleged harasser is a "supervisor" under the narrow definition adopted by the Eighth Circuit in *Weyers* and *Joens II*, summary judgment is not appropriate. Therefore, the defendant's renewed motion for summary judgment is **denied**.

**IT IS SO ORDERED.**

be remanded for new trial. *Id.* at 598–99. The *Todd* court also found fault with the jury instruction in that the jury could "have found [the defendant] liable for [the employee's] harassment solely by reason of his apparent authority." *Id.* at 598. In support for this statement, the *Todd* court pointed to the following comment in *Ellerth:* "[a]pparent authority analysis is therefore inappropriate in this context." *Id.* (quoting *Ellerth*, 118 S.Ct. at 2268). The *Todd* court's treatment of apparent authority was subject to the concurring opinion of Judge Arnold. Though he concurred with the judgment of the court, Judge Arnold did not agree that *Ellerth* automatically precluded consideration of apparent authority. *Id.* at 599–600 (Arnold, J., concur-ring in judgment). Judge Arnold contended that the sentence in *Ellerth* was taken out of context, and that a reading of the surrounding text made it clear that while the usual case would involve only abuse of actual authority, the Court did not rule out, as a matter of law, an "unusual" case in which the facts warranted consideration of apparent authority in determining an employer's vicarious liability. *Id.* (Arnold, J., concurring in judgment). As a full reading of *Ellerth* does not preclude application of an apparent authority analysis where it is warranted by the facts, and as the Eighth Circuit's approach to apparent authority is conflicting and appears to be *dicta*, the court is not compelled to disregard an apparent authority analysis in this case.